USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4-2-18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
WORLD TRADE CENTERS ASSOCIATION,     :
INC.,

                        Plaintiff,     :

        - against -                    :

THE PORT AUTHORITY OF NEW YORK        :
AND NEW JERSEY,                       :

                        Defendant.     :
-----------------------------------------------------------------X

15 Civ. 7411 (LTS) (RWL)

**REPORT AND
RECOMMENDATION**

ROBERT W. LEHRBURGER, United States Magistrate Judge.

**TO THE HONORABLE LAURA TAYLOR SWAIN, U.S.D.J.:**

World Trade Centers Association, Inc. ("WTCA"), brings this action against the Port Authority of New York and New Jersey ("Port Authority"), alleging trademark infringement, unfair competition, and breach of contract claims.  WTCA contends that the Port Authority's broad use of the mark "WORLD TRADE CENTER" on, among other things, merchandise at the One World Trade Center observatory infringes on WTCA's rights in the mark.

During the course of discovery in this action, filed in 2015, the Port Authority learned that WTCA routinely destroyed documents from 2011 to 2014.  The Port Authority then moved for spoliation sanctions pursuant to Federal Rule of Civil Procedure 37 and the Court's inherent authority, contending that the paper documents and electronically stored information ("ESI") were relevant and destroyed either negligently or in bad faith.[1]

---

[1] Both Parties have also moved for summary judgment in this action.  WTCA moved for summary judgment on June 28, 2017, and the Port Authority moved on August 7, 2017.

1

The Port Authority seeks sanctions, including an adverse inference instruction or dismissal of this case.  For the reasons stated below, I recommend that the Port Authority's motion be denied.

Background

In 1961, the Port of New York Authority[2] published a report advocating for the construction of a World Trade Center in lower Manhattan.  (Plaintiff's Local Civil Rule 56.1 Statement ("Pl. 56.1"), ¶¶ 1-2.[3])  That same year, the Port Authority began using the mark WORLD TRADE CENTER in "[a]dvising businessmen as to prospective customers and suppliers for products and services" and "[e]recting international trade facilities."  (Pl. 56.1, ¶¶ 3-4.)  The Port Authority also created the World Trade Department, with Guy Tozzoli as its director.  (Pl. 56.1, ¶ 5.)  This Department was tasked with, among other things, developing and operating the New York World Trade Center.  (Pl. 56.1, ¶ 6.)  WTCA was later formed by employees within the Port Authority's World Trade Department and was incorporated in 1969.  (Pl. 56.1, ¶¶ 5, 11.)  WTCA'S certification of incorporation stated that its purpose was, among other things, to encourage the expansion of world trade and promote international business relationships.  (Pl. 56.1, ¶ 12.)  Tozzoli was its president from 1970 until 2012.  (Pl. 56.1, ¶¶ 16, 52.[4])

---

[2] Now known as the Port Authority of New York and New Jersey.

[3] For the factual background of this case, the Court generally refers to uncontroverted facts in the Parties' statements made pursuant to Local Civil Rule 56.1 and accompanying their motions for summary judgment.

[4] The Parties have made broad redactions to material filed on the public docket and have filed numerous documents under seal.  Given the strong preference for the public's right to access court records, *see Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006), the Court sees no reason why the facts from those submissions stated in this Report and Recommendation should be redacted.

WTCA and the Port Authority then entered into a series of agreements that underlie WTCA's claim of exclusive use and ownership of the marks at issue here.  On February 18, 1986, the Port Authority executed a Confirmatory Assignment to WTCA.  The agreement reads, in part:

> PORT AUTHORITY has sold and does hereby sell, transfer and convey to WTCA, its successors, assigns and legal representatives, the entire right, title and interest in and to said service mark WORLD TRADE CENTER, said service mark registrations and the good will of PORT AUTHORITY's business in the services in respect of which the mark is used, together with all rights to apply for, obtain and hold registrations of the same and renewals and extensions thereof, and together with all right to bring suit for any past and future infringement of said mark. PORT AUTHORITY reserves to itself the right and license to use said service mark for the existing and future services.

(Confirmatory Assignment, attached as Ex. 1 to Amended Complaint dated May 31, 2017 ("5/31/17 Amend. Compl."), at 2.)  Then, on March 6, 1986, the Port Authority and WTCA entered into a license agreement as licensee and licensor, respectively, regarding the Port Authority's use of certain WTCA service marks and registrations.   (License Agreement, attached as Ex. 2 to 5/31/17 Amend. Compl.)  It states in relevant part:

> LICENSOR hereby grants to LICENSEE, and LICENSEE hereby accepts, subject to the provisions hereof, all of which are conditions of such grant, a non-exclusive license to use during the term of this license the Licensed Marks for the service of fostering world trade and for such additional trade services as LICENSOR may from time to time approve in writing.

(License Agreement at 2.)  It further states that if "in LICENSOR'S opinion any particular services inspected do not conform to LICENSOR'S specifications, LICENSEE and any sublicensee shall not thereafter use the Licensed Marks in any way in connection with the sale or advertising of such services."  (License Agreement at 3-4.)

In 2006, the Port Authority took ownership of 1 World Trade Center LLC ("1 WTC"), which held the lease for the One World Trade Center building in New York.  (Pl. 56.1, ¶

3

101.)   That same day, 1 WTC and WTCA entered into an "Amended and Restated Trademark License Agreement"; 1 WTC was the licensee and WTCA the licensor.  (Pl. 56.1, ¶ 104.)  It states, in part:

> Licensee acknowledges and agrees that all right, title and interest in and to all of the Licensed Property and all goodwill of the business symbolized by the Marks is and shall at all times be owned solely and exclusively by Licensor, its successors and assigns and that nothing in this Agreement shall give Licensee any right, title, or interest in any of the Licensed Property, other than the limited, non-exclusive right to use the Marks for the License Term, subject to the terms and conditions of this Agreement. In consequence of Licensor's ownership of the Licensed Property and said goodwill, Licensee shall not initiate or undertake any acts inconsistent with such ownership.

(Amended and Restated Trademark License Agreement ("2006 Agreement"), attached as Ex. 4 to 5/31/17 Amend. Compl., at 3.)  It defines "Marks" as:

> [T]he terms and/or designations (including word marks, logo marks, and names, as appropriate) "WORLD TRADE CENTER", "WTC", and the Map Design Logo (as depicted in Exhibit B), and any and all other terms and/or designations owned by Licensor at the Commencement Date or thereafter (as the case may be) and made hereafter a part of this Agreement by adding same, pursuant to written agreement between the parties, to the terms and/or designations initially licensed for use.

(2006 Agreement at 2.)  WTCA contends that this series of agreements, along with its registration for the trademark WORLD TRADE CENTER with the United States Patent and Trademark Office, are the basis for its exclusive ownership and control of the mark. (5/31/17 Amend. Compl., ¶¶ 13-14,16.)

From late 2011 to early 2012, the Parties had a disagreement over 1 WTC's and the Port Authority's use of the WORLD TRADE CENTER mark.  In October 2011, the Port Authority sent WTCA a letter requesting that WTCA consent to 1 WTC using a stylized World Trade Center logo in connection with advertising, marketing, and communications at the One World Trade Center.  (Letter of Philippe Visser dated Oct. 21, 2011, attached

as Ex. 63 to Declaration of Bruce R. Ewing dated June 28, 2017 ("Ewing Decl."), at 1.) WTCA did not agree to the Port Authority's proposed uses. (Pl. 56.1, ¶ 135.) On January 10, 2012, the Port Authority sent a letter stating that despite WTCA's reservation, 1 WTC would "proceed with its plans to use the 1WTC logo." (Pl. 56.1, ¶ 136.) On January 12, 2012, WTCA sent a letter to the Port Authority stating, "Should the Port Authority 'proceed with its plans to use the 1 WTC Logo in Connection with Tower 1,' the WTCA is prepared to take all necessary steps to protect its Marks and rights under the Agreement, including but not limited to seeking judicial intervention." (Letter of Richard J. Freuh dated January 12, 2012 ("Freuh Letter"), attached as Ex. 111 to Declaration of Leon Medzhibovsky dated Sept. 28, 2017 ("Medzhibovsky Decl."), at 2.) The observatory at the One World Trade Center opened in May 2015, and since then it has sold merchandise bearing the World Trade Center and One World Trade Center marks. (Pl. 56.1, ¶ 147; Ex. 7 to 5/31/17 Amend. Compl., ¶ 28.)

WTCA filed this action on September 18, 2015. Documents produced during discovery were limited in number because most of WTCA's documents were destroyed in the September 11, 2001 terrorist attacks. (Declaration of Scott Richie dated Oct. 16, 2017 ("Richie Decl."), ¶ 10.) In May 2017, during discovery, the Port Authority learned that WTCA may have destroyed relevant evidence between 2011 and 2014. (Transcript of Hearing before the Honorable Andrew J. Peck, U.S.M.J., dated May 30, 2017, at 22-25.)

On September 28, 2017, the Port Authority moved for spoliation sanctions, arguing that WTCA destroyed relevant documents and ESI. The Port Authority argues that documents were lost or destroyed when: (1) Nancy Nicholson – a consultant hired by

5

WTCA to assist with its office move in 2013 and 2014 – allegedly destroyed a large number of relevant paper files, including business records and documents of Tozzoli; (2) WTCA switched email server providers in 2011; (3) WTCA "washed" twenty-five "computer drives"; and (4) certain documents on a shared drive were migrated to a new server and lost in 2013.  (Memorandum of Law in Support of the Port Authority's Motion for Sanctions Against WTCA for Spoliation, Concealment of Spoliation, and Violation of Discovery Orders ("Def. Memo.") at 8-11.)

Discussion

A.  Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *In re Terrorist Bombings of U.S. Embassies in East Africa*, 552 F.3d 93, 148 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Allstate Insurance Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 457 (2d Cir. 2007)).  The court's power to impose sanctions for spoliation derives from both Federal Rule of Civil Procedure 37 and the court's inherent supervisory authority.  *R.F.M.A.S., Inc. v. So*, 271 F.R.D. 13, 22 (S.D.N.Y. 2010); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  The party moving for sanctions must demonstrate the following three elements: "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense."  *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012) (internal quotation

6

marks omitted) (quoting *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

"The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001) (citation omitted).  Any sanction that a court chooses to impose should be designed to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998)); *accord Chin*, 685 F.3d at 162.  "Thus, how severe a sanction is warranted will depend on the extent of the discovered party's non-compliance with discovery obligations, the degree of that party's culpability, and the extent to which the non-compliance prejudiced the other parties." *R.F.M.A.S.*, 271 F.R.D. at 24.  "[I]t is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 707 (S.D.N.Y. 2017) (quoting *Dorchester Financial Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 185 (S.D.N.Y. 2014)).

B. <u>Timing of the Duty to Preserve</u>

"Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?" *Zubulake*, 220 F.R.D. at 216.  "'The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation,' including instances where suit has

7

not been filed but the party 'should have known that the evidence may be relevant to future litigation.'" *Mastr Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*, 295 F.R.D. 77, 82 (S.D.N.Y. 2013) (quoting *Kronisch*, 150 F.3d at 126).[5] "Thus, the preservation requirement arises when a party reasonably anticipates litigation." *Id.* (quoting *Orbit One Communications, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010)).  The standard is an objective one, asking "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation."  *Id.* (quoting *Apple Inc. v. Samsung Electronics Co.*, 888 F. Supp. 2d 976, 990-91 (N.D. Cal. 2012)).

WTCA's duty to preserve evidence related to this litigation arose in January 2012. From October 2011 to January 2012, the Parties discussed 1 WTC's requests to use the World Trade Center mark as a logo at One World Trade Center.  (Freuh Letter at 1.)  After a December 16, 2011 meeting between the Parties, WTCA decided not to consent to the use of the logo, and the Port Authority asked for WTCA's position to be stated in writing, which WTCA did on December 20, 2011.  (Freuh Letter at 1.)  Then, on January 10, 2012, the Port Authority sent a letter to WTCA stating that WTCA's disapproval of the mark was unreasonable and that it would proceed with the use of the logo regardless of WTCA's position.  (Freuh Letter at 1; Pl. 56.1, ¶ 136.)  On January 12, 2012, WTCA sent a letter to the Port Authority warning that should the Port Authority proceed, "the WTCA is

---

[5] *See also In re Terrorist Bombings of U.S. Embassies of East Africa*, 552 F.3d at 148 ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." (quoting *Fujitsu*, 247 F.3d at 436)).

8

prepared to take all necessary steps to protect its Marks and rights under the Agreement, including but not limited to seeking judicial intervention." (Freuh Letter at 2.)

WTCA contends that this exchange created only a limited duty to preserve because the January 2012 dispute "concerned only the scope of [Port Authority]'s rights under the 2006 License Agreement, and whether those rights encompassed a particular planned logo, not the challenge the [Port Authority] would later make to the claim of any ownership rights by WTCA in the WTC Marks." (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Sanctions ("Pl. Memo.") at 17 (emphasis omitted).) But for WTCA to "take all necessary steps to protect its Marks," WTCA would need to demonstrate ownership over the mark, and that would entail litigation over and discovery on the 1986 agreements and the Parties' understanding of those agreements. Additionally, because the Port Authority was clearly involved in 1 WTC's request to use the mark, WTCA's course of dealings with the Port Authority regarding trademarks and service marks would be at issue. Therefore, the date that WTCA should have begun retaining relevant evidence is January 2012.

The Port Authority contends that WTCA's duty to preserve arose earlier, in June 2011, because WTCA was then preparing for litigation against the Port Authority. (Def. Memo. at 21.) The only evidence indicating that 2011 is the appropriate date are minutes of two WTCA board meetings from June and October 2011. But these minutes only show that WTCA was in a dispute with the Port Authority over whether WTCA would have office space at the World Trade Center Complex. (Approved WTCA Board Minutes dated June 10, 2011, attached as Ex. 3 to Medzhibovsky Decl., at 3; Approved WTCA Board Minutes dated October 9, 2011, attached as Ex. 4 to Medzhibovsky Decl., at 2.) To be sure,

9

WTCA then had a duty to preserve evidence related to that dispute, but that duty did not extend to the trademark dispute at issue here.  *See Zubulake*, 220 F.R.D. at 217-18 (the duty to preserve only extends to "information that is relevant to the claims or defenses of . . . the subject matter involved in the action" (internal quotation marks omitted) (quoting Fed. R. Civ. P. 26(b)(1))).

Although WTCA's duty to preserve did not arise until January 2012, the Court will consider in its analysis evidence allegedly destroyed in 2011.  Even if the duty to preserve had arisen at that time, there is no indication that WTCA destroyed relevant documents or any ESI, as discussed below.

C.  WTCA's Litigation Hold and Document Retention Efforts

WTCA did not institute a litigation hold suspending its normal document retention policies until September 2013.[6]  (Kassof Decl., ¶¶ 4, 7; Kassof Dep. at 34.)  That does not mean, however, that WTCA failed to implement appropriate preservation procedures. Nor does it mean that WTCA is automatically subject to sanctions.  *See Orbit One*, 271 F.R.D. at 441 (the failure of a party to "abide by recommended preservation practices" does not require the court to presume that the destroyed evidence was relevant); s*ee also Chin*, 685 F.3d at 162 (failure of a party to institute a litigation hold does not constitute gross negligence *per se*).  Rather, the Second Circuit Court of Appeals has held that "the better approach is to consider [the failure to adopt good preservation practices] as one

---

[6] It is not clear from the record whether the hold was in writing or only communicated verbally.  It was, however, communicated to both Nicholson and WTCA's email service provider, mindSHIFT.  (Declaration of Lindsay Kassof dated Oct. 16, 2017 ("Kassof Decl."), ¶ 5; Deposition of Lindsay Kassof dated June 2, 2017 ("Kassof Dep."), attached as Ex. 18 to Medzhibovsky Decl., at 33; Declaration of Nancy Nicholson dated Oct. 12, 2017 ("Nicholson Decl."), ¶¶ 6-8.)

factor in the determination of whether discovery sanctions should issue." *Chin*, 685 F.3d at 162 (alteration in original) (internal quotation marks omitted) (quoting *Orbit One*, 271 F.R.D. at 441). Given the circumstances of this case, as discussed below, sanctions are not warranted because WTCA implemented procedures sufficient to preserve relevant documents, and there is no evidence that any relevant material was destroyed. The following analysis first addresses destruction of paper documents and then addresses the alleged deletion of ESI.

D. Paper Documents

The Port Authority contends that Nicholson, WTCA's independent contractor, destroyed relevant paper evidence during her 2013-2014 tenure with WTCA. The Court finds that although Nicholson did destroy paper documents, neither she nor WTCA acted in bad faith, and there is no evidence that any documents she discarded were relevant.

1. Facts Relevant to the Destruction of Paper Documents

WTCA retained Nicholson to assist with WTCA's relocation to a new office building. She was tasked with negotiating a new lease; rearranging, reviewing, and discarding corporate files; migrating electronic files to a new domain; evaluating vendor contracts; and assisting in implementing new procedures to streamline operations in WTCA's Member Services Department.[7] (Deposition of Nancy Nicholson ("Nicholson Dep."), attached as Ex. 21 to Medzhibovsky Decl., at 10-14; Nicholson Decl., ¶¶ 4-5; Nancy Nicholson LinkedIn Profile, attached as Ex. 37 to Medzhibovsky Decl., at 2.)

---

[7] The Port Authority's portrayal of Nicholson as an "independent document-purging contractor" (Def. Memo. at 11-12) mischaracterizes the record.

11

Nicholson began those tasks in March 2013, prior to WTCA's implementation of a litigation hold.[8] (Nicholson Dep. at 10.) Nonetheless, she received instructions expressly addressing the types of documents that would be relevant to this dispute. Specifically, WTCA's internal counsel, Scott Richie, instructed her to retain everything related to legal, the Port Authority, trademark, and contracts. (Nicholson Decl., ¶ 6.) Richie also instructed Nicholson that if she had questions regarding whether certain documents fell into those delineated categories, she should take those documents to Richie or Niurka Coteron, WTCA's Comptroller and Director of Corporate Services. (Nicholson Dep. at 34-35; Nicholson Decl., ¶ 7; Richie Decl., ¶ 31.)

Nicholson reviewed at least 150 boxes of records. (Nicholson Decl., ¶ 6.) No more than ten of the boxes contained employee records, including those of Tozzoli. (Nicholson Dep. at 48-49.) Nicholson followed Richie's instructions, retaining documents related to legal matters, trademark, contracts, and the Port Authority, and she either gave the documents to Richie for his review or put them "in their proper space." (Nicholson Dep. at 35-36.) It is not clear precisely how many documents were saved and how many were

---

[8] WTCA had in place a written document retention policy at the time Nicholson began her work. It instructed employees to retain, among other things, the following: all trademark registrations and documents relating to enforcement proceedings, settlements, and cease-and-desist letters permanently; legal files for ten years; and general business correspondence one year after the subject matter was no longer active. (WTCA Record Retention Policy, attached as Ex. 1 to Richie Decl., at 2-3.) And, it instructed employees to retain material related to future litigation: "If you believe, or the Company informs you, that Company records are relevant to litigation, or potential litigation (i.e., a dispute that could result in litigation), then you must preserve those records until the General Counsel determines the records are no longer needed." (WTCA Record Retention Policy at 1.) Nicholson, however, was unaware of that policy. (Nicholson Dep. at 32-34.)

destroyed.[9]    Nicholson discarded duplicates of documents; email printouts, including those of Tozzoli; old personnel files; and vendor payment records.  (Nicholson Decl., ¶¶ 10, 14, 20.)    She gave at least five or six boxes of documents to legal for review.  (Nicholson Dep. at 58-59.)  Richie retained those documents and produced them during this litigation.  (Richie Decl., ¶¶ 31-32.)  While a written litigation hold typically would be the best practice, the instructions and procedures implemented by WTCA with respect to preservation of relevant material by Nicholson were adequate to ensure that WTCA retained material relevant to this case.

### 2.  Culpability Prong

WTCA's actions were at least negligent, but its actions do not constitute either sanctionable gross negligence or bad faith.  The level of culpability is important because when bad faith is found, the court presumes relevance; and when a party is grossly negligent, relevance is presumed under certain circumstances and a movant need not separately demonstrate the relevance of the material.  *See Byrnie v. Town of Cromwell*, 243 F.3d 93, 108 (2d Cir. 2001) ("[A]t times, [the Second Circuit has] required a party to have intentionally destroyed evidence; at other times [it has] required action in bad faith;

---

[9] The Port Authority's cited evidence does not shed light on the extent of documents destroyed.  For instance, the Port Authority contends that eighty percent of documents reviewed by Nicholson were "purged" (Def. Memo. at 13), but the record states only that eighty percent of the documents in the "public" drive were "sorted, filed and purged" (WTCA 120 Day Report ("120 Day Report"), attached as part of Ex. 29 to Medzhibovsky Decl., at 3).  The Port Authority also points to pictures of bags of shredded paper, but it is not clear from those pictures how many documents were actually destroyed.  (Pictures attached as part of Ex. 29 to Medzhibovsky Decl.)  Additionally, three "dumpsters" of "old reports, marketing materials, supplies, [and] equipment" were removed from WTCA's office, but it is not clear to what extent any of those materials were documents or how many documents were in the dumpsters.  (World Trade Centers Association – 45 Day Report, attached as part of Ex. 30 to Medzhibovsky Decl., at 149358.)

and at still other times [it has] allowed an adverse inference based on gross negligence . . . .").[10]

"A court may impose sanctions [for destruction of paper documents] if it finds that the party acted at least negligently in destroying or losing the spoliated material." *In re Pfizer Inc. Securities Litigation*, 288 F.R.D. 297, 314 (S.D.N.Y. 2013). "In the discovery context, negligence is a failure to conform to the standard of what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *Id.* (internal quotation marks omitted) (quoting *Harkabi v. SanDisk Corp.*, 275 F.R.D. 414, 418-19 (S.D.N.Y. 2010)). Courts in this district have acknowledged that "[o]nce the duty to preserve attaches, any destruction [] is, at a minimum, negligent." *Slovin v. Target Corp.*, No. 12 Civ. 863, 2013 WL 840865, at *4 (S.D.N.Y. March 7, 2013) (alterations in original) (internal quotation marks omitted) (quoting *Zubulake*, 220 F.R.D. at 220).

A party acts in bad faith when it destroys documents with "an intent to obstruct the opposing party's case." *Curcio v. Roosevelt Union Free School District*, 283 F.R.D. 102, 113 n.7 (E.D.N.Y. 2012) (quoting *Byrnie*, 243 F.3d at 109). To act in bad faith or with gross negligence, the party's conduct must be "sufficiently egregious." *Orbit One*, 271 F.R.D. at 439; *Passlogix, Inc. v. 2FA Technology, LLC*, 708 F. Supp. 2d 378, 411-12

---

[10] *See also Chin*, 685 F.3d at 162 ("[A] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction."); *Orbit One*, 271 F.R.D. at 438-39 ("When evidence is destroyed in bad faith, that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions: that it would have been of assistive relevance. Indeed, under certain circumstances 'a showing of gross negligence in the destruction or untimely production of evidence' will support the same inference." (citation omitted) (quoting *Residential Funding*, 306 F.3d at 109)).

14

(S.D.N.Y. 2010). A "case-by-case approach" is used because the failure to produce evidence occurs "along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality." *Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)).

WTCA's destruction of documents was at least negligent. It failed to impose a document hold at the time it was first on notice of foreseeable litigation in January 2012. *See Zubulake*, 220 F.R.D. at 220 (any destruction of documents when a party has a duty to preserve evidence is negligent). WTCA's instructions to Nicholson were oral, not written, and Nicholson was only an outside consultant, not experienced with WTCA's business. The record does not show whether WTCA had any quality control mechanism in place to ensure Nicholson properly carried out her instructions, although she did present Richie with five or six boxes of saved material for review. (Nicholson Dep. at 59.)

But WTCA's conduct was not sufficiently egregious to support a finding of either gross negligence or bad faith. To the contrary, WTCA's counsel expressly instructed Nicholson to retain anything relating to trademark, legal, or the Port Authority, and to ask Richie any questions she may have concerning the proper designation of the documents. *See Centrifugal Force, Inc. v. Softnet Communication, Inc.*, 783 F. Supp. 2d 736, 742 (S.D.N.Y. 2011) (oral instructions given to employee to retain relevant evidence were sufficient); *Orbit One*, 271 F.R.D. at 441 ("For instance, in a small enterprise, issuing a written litigation hold may not only be unnecessary, but it could be counterproductive, since such a hold would likely be more general and less tailored to individual records custodians than oral directives could be. Indeed, under some circumstances, a formal

15

litigation hold may not be necessary at all."). At her deposition, Nicholson stated that she discarded some physical documents of former employees – including business records, e-mails, letters, and memos but that she retained documents in the categories specified by Richie. (Nicholson Dep. at 46-47, 58; Richie Decl., ¶ 31.) And while she destroyed paper printouts of Tozzoli's email, electronic versions of those emails were preserved and searched. (Kassof Dep. at 24, 50; Nicholson Decl., ¶ 14; Richie Decl., ¶ 24.) Nicholson's deposition on these points is consistent throughout and is harmonious with both her declaration and Richie's declaration. (Nicholson Dep. at 34-36, 38-39, 43, 56, 60; Nicholson Decl., ¶ 12; Richie Decl., ¶ 31.) Richie retained all the documents identified by Nicholson in the enumerated categories and produced them in this litigation. (Richie Decl., ¶ 32.)

In a further attempt to show WTCA's bad faith, the Port Authority contends that WTCA could have warehoused the paper documents for a fraction of the price it cost Nicholson to destroy them. (Email of Anthony Poretto dated April 23, 2013, attached as part of Ex. 24 to Medzhibovsky Decl.) That may be so, but it is irrelevant. Nicholson was hired to sort and file documents, not only to destroy them. (Nicholson Dep. at 59-60.) Nicholson's efforts to sort and categorize documents had its own benefit, including "[i]ncreased availability of information to staff, and enhanced user experience." (120 Day Report at 3.) The Court finds the Port Authority's argument of little merit.

The Port Authority further argues that WTCA actively concealed its document destruction during discovery. The Port Authority points to its document requests, which defined "document" to include data "which has since been deleted." (Def. Memo. at 15.) "Deletion," however, is a term that seems most aptly applied to ESI, less so to paper

documents. In any event, during discovery WTCA did produce information indicating that certain documents had been destroyed. Specifically, it produced two "CEO Updates" that referred to the filing, sorting, and "purging" of paper documents by Nicholson. (Ex. 18 to Ewing Decl. at 4; Ex. 19 to Ewing Decl. at 4.)

In the same vein, the Port Authority contends that WTCA's counsel represented at a May 31, 2017 hearing that WTCA had no more documents related to spoliation other than the CEO Updates. (Def. Memo. at 24.) This distorts the record. WTCA's counsel represented that "we have not found anything in the materials that were previously uploaded by us that pertains to that. This does seem to be the only document. Now, I can make an effort to go back and maybe look at files or boxes and destruction from 2013 which is when the relevant events happened, but I can't do a fulsome search on 48 hours' notice." (Transcript dated May 31, 2017, at 3.) Following through on that effort to look further, WTCA located and produced 290 documents relating to the destruction of documents. (Affidavit of Jawan Green dated Sept. 28, 2017 ("Green Aff."), ¶ 38.)

Considering the facts discussed above, in addition to all the other actions by WTCA discussed throughout this Report and Recommendation, the Port Authority has not sustained its burden to show that WTCA acted in bad faith or with gross negligence. *See Mastr Adjustable Rate Mortgages Trust*, 295 F.R.D. at 81, 85 (no evidence of bad faith where relevant documents were retained through counsel's document retention policy); *Centrifugal Force*, 783 F. Supp. 2d at 742-43 (verbal instructions to employee to retain relevant evidence were sufficient).

### 3. Relevance Prong

When the destruction of documents is negligent, "the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *Residential Funding Corp.*, 306 F.3d at 109 (alteration in original) (internal quotation marks omitted) (quoting *Kronisch*, 150 F.3d at 127). In other words, the party seeking sanctions must demonstrate that a reasonable trier of fact could find that "the missing records would have been unfavorable to the spoliator." *De Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2007 WL 1686327, at *7 (S.D.N.Y. June 6, 2007); *see also Osberg v. Foot Locker*, No. 07 Civ. 1358, 2014 WL 3767033, at *7 (S.D.N.Y. July 25, 2014) ("Accordingly, [the party seeking sanctions] must 'demonstrate that the destroyed evidence would have been favorable to' him." (quoting *Zubulake*, 220 F.R.D. at 221)). "Such a showing can be made on the basis of extrinsic evidence." *Rhoda v. Rhoda*, No. 14 Civ. 6740, 2017 WL 4712419, at *4 (S.D.N.Y. Oct. 3, 2017). "Typically, the evidence used to establish relevance of missing documents is deposition testimony." *De Espana*, 2007 WL 1686327, at *8.

The movant's burden, however, is tempered by the concern that a party who destroys document should not benefit from the unavailability of proof wrought by the destruction. "[T]he burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous, lest the spoliator be permitted to profit from its destruction." *Orbit One*, 271 F.R.D. at 440 (quoting *Heng Chan v. Triple 8 Palace, Inc.*, No. 03 Civ. 6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005); *see also Kronisch*, 150 F.3d at 128 ("[To] hold[] the prejudiced party to too strict a standard of

18

proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction.").

There is no evidence demonstrating that WTCA destroyed any relevant documents, and despite substantial efforts, the Port Authority has not shown otherwise. Instead, WTCA's conduct during Nicholson's employment is entirely consistent with the consolidation and organization of paper documents in connection with an office move. To be sure, Nicholson destroyed business records, emails, letters, and memos under the supervision of Richie, and some documents that she destroyed included parts of senior executives' files, such as printouts of Tozzoli's emails. (Nicholson Dep. at 46-47, 51.) But, as stated previously, Nicholson retained all documents involving trademark, the Port Authority, legal documents, and contracts. (Nicholson Dep. at 34-36.)   Relevant documents obtained from that process were reviewed and produced during discovery. (Richie Decl., ¶ 32.)   And, while paper copies of Tozzoli's emails were destroyed, electronic versions were kept.[11]  (Kassof Dep. at 24, 51-52; Nicholson Decl., ¶ 14; Richie Decl., ¶ 24.)

The Port Authority argues that because WTCA did not produce very many documents dated before 2011, and produced many dated after those years, that WTCA

---

[11]  The Port Authority claims that some key executives at WTCA produced very few documents: 141 from Tozzoli; 104 from Weintrob; and 279 from DiChiara. (Def. Memo. at 14.)  However, the evidentiary support for this contention references only emails produced by WTCA; it does not take into account any paper documents. (Green Aff., ¶¶ 25-27.)

must have destroyed relevant documents.  The following list shows the number of documents that WTCA produced for each year:

- 2,485 documents with a date stamp of 2015.
- 3,156 documents with a date stamp of 2014.
- 3,209 documents with a date stamp of 2013.
- 2,095 documents with a date stamp of 2012.
- 1,763 documents with a date stamp of 2011.
- 861 documents with a date stamp of 2010.
- 399 documents with a date stamp of 2009.
- 410 documents with a date stamp of 2008.
- 499 documents with a date stamp of 2007.
- 474 documents with a date stamp of 2006.
- 115 documents with a date stamp of 2005.

(Green Aff., ¶¶ 9-19.)  This list shows little, if anything, regarding the relevance of documents and is, by itself, unhelpful.  Indeed, the number of WTCA documents produced appears to have increased gradually from 2005 to 2013.  For instance, while WTCA produced about 900 more documents from 2011 than from 2010, there was a comparable jump from 2012 to 2013.  Meanwhile, there was a decrease in the number of documents produced from 2013 to 2015, when WTCA's document hold was fully in place.  These trends do not demonstrate anything regarding the relevance of the documents.

To show that WTCA should have possessed a greater number of relevant documents than what was produced, the Port Authority also relies on declarations from Barry Weintrob and Robert DiChiara, two former WTCA executives.  Weintrob was WTCA's CFO from 1997 to 2010.  (Affidavit of Barry Weintrob dated Aug. 1, 2017 ("Weintrob Decl."), ¶ 12.)  DiChiara was WTCA's Executive Vice President from 2001 to 2009, and Vice President of Business Development from 1997 to 2001.  (Affidavit of Robert DiChiara dated July 31, 2017 ("DiChiara Decl."), ¶¶ 4-5.)  Before their employment with WTCA, the Port Authority had employed both Weintrob and DiChiara.  (DiChiara

20

Decl., ¶¶ 8-10; Weintrob Decl., ¶¶ 3-11.)  Both executives submitted declarations stating that they kept many paper files, including memos, reports, financial data, communications, and letters.  (DiChiara Decl., ¶ 28; Weintrob Decl., ¶ 16.)  Weintrob stated:

> I kept many types of electronic and paper files, such as internal WTCA memoranda, reports, financial data and accounting records, as well as communications, letters and emails to members, Guy Tozzoli, WTCA board members, counsel, banks, financial firms, insurance companies, accountants and the Port Authority.

(Weintrob Decl., ¶ 16.)  DiChiara's declaration is worded similarly:

> I kept many types of files, including internal WTCA memoranda, reports, financial data and accounting records, as well as communications, letters and emails to members, Guy Tozzoli, counsel, accountants and the Port Authority.

(DiChiara Decl., ¶ 28.)  Both DiChiara and Weintrob asserted, "Many of the documents that I maintained related to WTCA's regular and ordinary course of conduct, including WTCA's relationship with the Port Authority and the course of conduct between the parties."  (DiChiara Decl., ¶ 28; Weintrob Decl., ¶ 16.)

These declarations do not inform the relevance inquiry.  They are conclusory and overly general.  While both DiChiara and Weintrob claim to have kept business records, memoranda, and reports, neither state that the records related to any specific subject relevant to the litigation.  And, neither state that any communications with the Port Authority included information that would be relevant and discoverable here.

Considering the Port Authority's evidence discussed in connection with paper documents (as well as with ESI, below), I find that the Port Authority has not sustained its burden of showing that any of the destroyed documents were relevant.  Accordingly, I

21

recommend that the Port Authority's motion for sanctions relating to the destruction of paper documents be denied.

E. <u>ESI</u>

The Port Authority contends that WTCA destroyed or lost relevant ESI. It offers the following arguments: (1) when WTCA switched email and ESI archive providers (from "EpiSolve" to "mindSHIFT"), ESI was lost or destroyed; (2) twenty-five "computer drives" were "washed" during the relevant time period; (3) WTCA's litigation hold was put in place after the duty to preserve arose; (4) in 2013, some documents on a shared drive were "migrated" to mindSHIFT but were allegedly lost; and (5) little ESI was produced from WTCA executives. As discussed herein, the Court finds that the Port Authority has not shown that any ESI was destroyed. WTCA's actions regarding ESI are consistent with normal business practices and are not consistent with the intentional or even negligent destruction of electronic documents.

1. <u>Legal Standard</u>

The Parties dispute which version of Rule 37(e), governing spoliation sanctions for destruction of ESI (but not paper documents), applies. A new version of the Rule became effective on December 1, 2015, making changes to the standard for imposing spoliation sanctions. Prior to the December 1, 2015 change to the Rule, the Second Circuit permitted severe spoliation sanctions upon a finding that the party had destroyed ESI evidence negligently. *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495 (S.D.N.Y. 2016); *see Residential Funding*, 306 F.3d at 108 (stating, in case filed prior to 2015, that an adverse inference could be appropriate when evidence was destroyed negligently). The new version of the Rule, however, rejects that construction. To impose

severe sanctions for spoliation, a court must now find that "the party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2).

The new Rule presumptively applies in all cases, "unless its application would be unjust or impracticable." *CAT3*, 164 F. Supp. 3d at 496 (citing 2015 US Order 0017; 28 U.S.C. § 2074(a)).  Courts often apply the earlier version of the Rule where the motion for sanctions both was filed before the December 2015 changes and where the conduct occurred before the changes.  *See Distefano v. Law Offices of Barbara H. Katsos, PC*, No. 11 CV 2893, 2017 WL 1968278, at *4 (E.D.N.Y. May 10, 2017) (collecting cases).

The destruction here occurred before 2015 (Nicholson Dep. at 15, 33; Kassof Dep. at 33), before the new Rule came into effect.  The spoliation motion, however, was filed in 2017.  The Port Authority points to no reason why the application of the new Rule would be unjust or impracticable, and the Court does not perceive any.  The Port Authority has not overcome the presumption that the amended Rule regarding ESI applies here.  *See Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 425 (W.D.N.Y. 2017) (applying new Rule where conduct occurred before 2015 but motion was filed after 2015); *CAT3*, 164 F. Supp. 3d at 496 ("The new rule places no greater substantive obligation on the party preserving ESI. . . .  Here, because the amendment is in some respects more lenient as to the sanctions that can be imposed for violation of the preservation obligation, there is no inequity in applying it.").

Accordingly, the Court will apply the current version of Rule 37(e).[12]  It states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take

---

[12] Even under the previous Rule 37(e) formulation, spoliation sanctions would not be warranted.  That is because, as discussed below, there is no evidence from which a reasonable inference can be made that relevant ESI was destroyed.

reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  The Court therefore must consider

> (1) whether electronic information that should have been preserved has been lost; (2) whether [the non-moving party] took "reasonable steps" to preserve that information; (3) whether the information can be restored or replaced through additional discovery; (4) whether [the moving party] has been prejudiced by the loss of the information; and, (5) whether [the non-moving party] acted with the intent to deprive [the moving party] of the information's use.

*Moody*, 271 F. Supp. 3d at 426 (citing *CAT3*, 164 F. Supp. 3d at 495-502).

    2.  <u>Application to WTCA's Treatment of ESI</u>

The Port Authority first argues that ESI was lost or destroyed during the migration of WTCA's ESI from the EpiSolve system to the mindSHIFT system in 2011.  The Port Authority highlights that, during discovery, WTCA produced fewer relevant ESI documents for the years preceding the change in vendors in 2011 thus suggesting that ESI from earlier years was not preserved.  (Green Aff. ¶¶ 8-19; Def. Memo. at 8-10.)  The Port Authority also points out that the change in systems was not documented and that no logs were produced to show what data was transferred.  (Def. Memo. at 8.)

24

This evidence is unpersuasive.  First, as with the paper documents, the fact that fewer documents were produced in the year before the migration was completed shows, by itself, very little.  The number of documents generally rose each year at a steady rate, and nothing appears out of the ordinary.  (*See* Green Aff., ¶¶ 9-19.)  Second, the Port Authority offers no reason why any log or documentation of the change would be required.  Meanwhile, mindSHIFT's chief legal officer provided a declaration stating that there was no indication that any emails were lost in the transition.  (Declaration of Steven Robinson dated Oct. 13, 2017 ("Robinson Decl."), ¶ 7.)  To ensure that no emails are lost during system migrations, mindSHIFT confirms that the customer "has a current backup of its email."  (Robinson Decl., ¶¶ 7, 26.)

The Port Authority has not shown that any ESI was destroyed during WTCA's system migration, much less that any relevant ESI was destroyed during the system migration.  *See Orbit One*, 271 F.R.D. at 441 ("[F]or sanctions to be appropriate, it is a necessary, but insufficient, condition that the sought-after evidence actually existed and was destroyed." (quoting *Farella v. City of New York*, Nos. 05 Civ. 5711 & 05 Civ. 8264, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007))).  Moreover, the change in vendors started in late 2010 and was completed in April 2011 (Robinson Decl., ¶¶ 6-7), before any duty to preserve arose.

The Port Authority's suggestion that the presence of twenty-five "washed" hard drives demonstrates culpability is entirely speculative.  There is no evidence suggesting the drives contained any relevant data.  Furthermore, WTCA provided a declaration from its general counsel stating that the computers' hard drives, before being wiped, had been copied onto a server.  (Richie Decl., ¶ 35.)  The Port Authority offered no contradictory

25

evidence.  The fact that an entity like WTCA possessed blank or "wiped" hard drives is not by itself indicative of any foul play.

The Port Authority's argument based on the timing of WTCA's litigation hold also is unavailing.  The Port Authority contends that ESI must have been destroyed because WTCA did not begin "preserving 'everything' [until] August 2014 – *years* after WTCA began plotting a legal strategy against the Port Authority."  (Def. Memo. at 9.)  While WTCA should have implemented a litigation hold after its dispute with the Port Authority in January 2012, there is no evidence that any relevant evidence was actually destroyed. Moreover, mindSHIFT's Chief Legal Officer stated that after 2011, no WTCA employee made any request to "delete or destroy any email or other data that [was] stored or hosted on mindSHIFT's servers" and that mindSHIFT did not delete "any email from WTCA's hosted email service or email archive."[13]  (Robinson Decl., ¶¶ 9, 26.)  The Port Authority's contention is simply too conclusory.

The Port Authority further argues that documents were lost in a specific incident when information was transferred from a shared WTCA drive to mindSHIFT in 2013.  The Port Authority bases this contention on the fact that, during discovery, WTCA's counsel sent a letter to the Port Authority's counsel stating that mindSHIFT failed to provide to WTCA complete email archives for certain custodians.  (Letter of Bruce Ewing dated June 15, 2017 ("Ewing Letter"), attached as Ex. 22 to Medzhibovsky Decl., at 1-2.)  Again, the Port Authority distorts the record.  WTCA counsel's letter makes clear that the deficient

---

[13] The Court acknowledges that the testimony that mindSHIFT did not delete any ESI does not mean that WTCA employees could not have independently deleted emails. Nonetheless, that possibility does not overcome the absence of any indicia that relevant ESI was destroyed.

production was due to an error in the collection process, not because emails were missing or had been destroyed.  (Ewing Letter at 1.)  MindSHIFT rectified the error and produced all responsive documents on its servers.  (Robinson Decl., ¶ 24.)

Lastly, the Port Authority points out that only 279 relevant emails were produced from DiChiara and 104 from Weintrob.  (Green Aff., ¶¶ 25, 27.)  These numbers prove nothing.  To the contrary, WTCA preserved and reviewed 206,124 electronic documents for these custodians.  (Declaration of Caroline Sweeney dated October 16, 2017, ¶¶ 4, 6.)  The numbers therefore show some other factor in play, such as lack of relevance, not lost evidence.

In sum, the Port Authority has not shown that any ESI, let alone any relevant ESI, was actually destroyed.  I therefore recommend denying the Port Authority's motion for sanctions relating to ESI.

## Conclusion

For the foregoing reasons, I recommend that the Port Authority's motion for sanctions be denied.  Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Laura Taylor Swain, Room 1640, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007.  Failure to file timely objections will preclude appellate review.

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:        New York, New York
              April 2, 2018

Copies transmitted to all counsel of record.