UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

WORLD TRADE CENTERS
ASSOCIATION, INC.,

        Plaintiff,

    -v-                          No.  15 CV 7411-LTS-RWL

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

        Defendant.

--------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

        In this action concerning the rights to use WORLD TRADE CENTER and related trade and service marks in connection with real estate, trade promotion, merchandising, and other activities, World Trade Centers Association, Inc. ("Plaintiff" or "WTCA") asserts claims against the Port Authority of New York and New Jersey ("Defendant" or the "Port Authority") for trademark infringement (1st Claim for Relief) and unfair competition and false designation of origin (2nd Claim for Relief) under the Lanham Act, New York common law trademark infringement (3rd Claim for Relief), New York common law unfair competition (4th Claim for Relief), and breach of contract (5th and 6th Claims for Relief), and seeks a declaration confirming that Defendant is bound by two licensing agreements that restrict it from affixing the relevant trademarks to goods without WTCA's consent (7th Claim for Relief).  (Am. Compl., Docket Entry No. 134.)  Defendant asserts counterclaims for a declaration that it has not infringed upon the subject marks (1st Counterclaim), a declaration that it has not breached the relevant licensing agreements (2nd Counterclaim), a declaration that it is the owner of the relevant service and trademarks and has the right to use them without Plaintiff's interference (3rd Counterclaim), the

cancelation of Plaintiff's federal service mark registration (4th Counterclaim), an order enjoining Plaintiff from prosecuting several pending federal trademark registration applications (5th Counterclaim), and breach of contract (6th Counterclaim). (Am. Counterclaims, Docket Entry No. 133.)

Cross-motions for summary judgment are now before the Court. Defendant Port Authority moves for summary judgment dismissing all of Plaintiff's claims and granting judgment in its favor on all counterclaims. (Docket Entry No. 162.) Plaintiff WTCA moves for partial summary judgment, specifically: for judgment in Plaintiff's favor on its breach of contract claim concerning a 2006 licensing agreement (6th Claim for Relief); to dismiss, in part, Defendant's counterclaims seeking a declaration that Defendant has not breached licensing agreements entered into in 1986 and 2006 (2nd Counterclaim), a declaration of ownership of certain marks and the right to use them free of Plaintiff's interference (3rd Counterclaim), and the cancelation of WTCA's federal service mark registrations (4th Counterclaim), and to dismiss, in its entirety, Defendant's counterclaim that seeks to enjoin WTCA's currently pending federal trademark applications (5th Counterclaim). Plaintiff also moves to strike three of Defendant's affirmative defenses – those asserting sovereign immunity (9th Affirmative Defense), the invalidity of Plaintiff's state and federal registrations as void ab initio or as fraudulently procured (5th Affirmative Defense), and the propriety of the Port Authority's concurrent use of the marks based on its continuing use of such marks, which commenced prior to any WTCA use of the marks (7th Affirmative Defense). (Docket Entry No. 146.)

The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331, 1338, 1367 and 15 U.S.C. sections 1119 and 1121.

The Court has considered the submissions of both parties carefully and, for the following reasons, grants the motions for summary judgment of both parties in part and denies them in part.

## I. BACKGROUND[1]

The Port Authority is an agency administered jointly by the states of New York and New Jersey charged with operating "aviation, rail, surface, transportation and seaport facilities." (Def. 56.1 ¶ 1.) The Port Authority also owns the World Trade Center ("WTC") site in Manhattan ("NYWTC") and is supervising the site's reconstruction following the previous complex's destruction as a result of the terrorist attacks of September 11, 2001. (Id. ¶¶ 1, 53.)

In 1961, the Port Authority's predecessor published a report proposing the development of a World Trade Center. (Id. ¶ 5.) The states of New York and New Jersey enacted legislation in 1962 authorizing the construction of the NYWTC. (Id.¶ 7.) Plans for the complex, including its iconic "twin towers," were announced in January of 1964, and construction commenced in 1966 and was completed in 1973. (Id. ¶¶ 10, 12-13.) The complex contained 10 million square feet of office space and hosted 40,000 workers and 150,000 business guests and tourists each day. (Id. ¶¶ 15, 17.)

NYWTC featured the "Top of the World" observation deck, which included two gift shops. (Id. ¶ 27.) From 1995 until the complex's destruction, the observation deck and gift

---

[1] The facts recited herein are undisputed unless otherwise indicated. Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Pl. 56.1 St.," "Def. 56.1 St.," "Pl. 56.1 Resp.," "Def. 56.1 Resp.," and "Def. 56.1 Reply") incorporate by reference the parties' citations to underlying evidentiary submissions.

shops were operated by Ogden Entertainment ("Ogden") under a lease from the Port Authority. (Id. ¶¶ 25, 27.)  Pursuant to its lease, Ogden was only authorized to sell merchandise bearing the WORLD TRADE CENTER or WTC legend or that of any other Port Authority property with the Port Authority's prior consent.  (Def. 56.1 St. ¶ 31; see Pl. 56.1 Resp. ¶ 31.)

From at least 1975 through the destruction of the original complex, the gift shops operated by the Port Authority and, later, Ogden, sold souvenirs bearing the WORLD TRADE CENTER or WTC mark.  (Hoffman Tr., Medzhibovsky Decl., Docket Entry No. 166, Ex. 9, at 26:15-24, 43:1-22, 44:19-46:11.)  A teddy bear branded with the WTC name was recovered from the wreckage of the NYWTC site following the September 1, 2001 attacks.  (Drakakis Aff., Docket Entry No. 188, ¶¶ 5-7; Drakakis Aff., Ex. C, Docket Entry No. 188-3, at ECF pg. 5-6.) According to the database of the 9/11 Memorial Museum, it had come from the observation deck of the South Tower where Ogden operated a gift shop.  (Drakakis Aff. ¶¶ 2-3, 5-7; Drakakis Aff., Ex. C, at ECF pg. 5-6.)

Beginning in 1968, Guy Tozzoli, then the director of the Port Authority's World Trade Department, received requests from other entities, also styled as World Trade Centers, that were interested in creating a network consisting of like entities.  (Def. 56.1 St. ¶¶ 11, 97-98.)  To help administer this network, the Port Authority incorporated WTCA on August 22, 1969, as a Delaware non-profit corporation.  (Id. ¶ 104; Pl. 56.1 St. ¶ 12.)  Initially, WTCA operated out of the Port Authority's offices and used Port Authority staff, primarily Tozzoli and Thomas Kearney, to carry out its operations.  (Def. 56.1 St. ¶¶ 105-108.)  Although WTCA received some funding from the dues of its members, much of its expenses were borne by the Port

Authority.  (Id. ¶¶ 107-109; Pl. 56.1 Resp. ¶ 109.)  In 1985, WTCA entered into a lease with the Port Authority for office space in the WTC complex.  (Def. 56.1 St. ¶ 111.)

By November 14, 1985, the Port Authority had obtained six New York State service mark registrations for the term WORLD TRADE CENTER, covering: (1) "advising businessman [sic] as to prospective customers and suppliers for products and services"; (2) "[o]perating facilities for commodities trading; promotion of financial commerce exchange"; (3) "[e]recting international trade facilities"; (4) telecommunications services; (5) "[c]ommuter rail services"; and (6) "[r]estaurant services, conducting exhibitions, seminars and business conferences; instructional services in international trade."  (Def. 56.1 St. ¶ 129.)  The service mark registrations for advising businessmen as to prospective customers and erecting international trade facilities list their dates of first use as March 1961.  (Docket Entry No. 149-4, at ECF p. 2, 4.)

On February 18, 1986, after discussions concerning the transfer of marks to WTCA for management and enforcement purposes, the Port Authority executed a Confirmatory Assignment of its service marks in favor of WTCA (the "1986 Assignment").  (1986 Assignment, Docket Entry No. 149-15.)  The Assignment recites  that the Port Authority "has adopted and used the service mark WORLD TRADE CENTER, for which it has obtained Argentine Service Mark Registrations 927594 and 937721" and the six New York service mark registrations, listed by registration number and the class of each activity covered.  (Id. at 1.)  The Assignment then provides that:

> PORT AUTHORITY has sold and does hereby sell, transfer and convey to
> WTCA, its successors, assigns and legal representatives, the entire right, title and
> interest in and to said service mark WORLD TRADE CENTER, said service
> mark registrations and the good will of PORT AUTHORITY's business in the
> services in respect of which the mark is used, together with all rights to apply for,

obtain and hold registrations of the same and renewals and extensions thereof, and together with all right to bring suit for any past and future infringement of said mark.  PORT AUTHORITY reserves to itself the right and license to use said service mark for the existing and future services.

(Id. at 2.)

Thereafter, on March 6, 1986, the Port Authority and WTCA executed a license agreement (the "1986 License"), in which WTCA agreed to license its "Licensed Marks" to Port Authority.  (1986 License, Docket Entry No. 149-17, at 1-2.)  The term "Licensed Marks" was defined to cover the eight New York and Argentine service marks enumerated in the 1986 Assignment, as well as a "Map Design Logo" and associated "U.S. Service Mark Registration No. 1,011,720, granted on May 27, 1985."[2]  (Id. at 1)  The 1986 License recites that WTCA, referred to as the Licensor, is the owner of the WORLD TRADE CENTER service marks, registrations and goodwill, as well as of the Map Design Logo and associated service mark registration and goodwill.  It defines the listed "service marks and registration[s]" as "the 'Licensed Marks.'"  The operative provision of the 1986 License grants the Port Authority a non-exclusive license to use the Licensed Marks for "the service of fostering world trade and for such additional trade services as Licensor may from time to time approve in writing."  (Id. at 1, ¶ 1, Ex. A ¶ 1.)  The 1986 License also includes quality control and inspection provisions for use of

---

[2]     According to the United States Patent and Trademark Office's Trademark Electronic Search System ("TESS"), the "Map Design Logo" was actually registered on May 27, 1975 for "services-namely, fostering and promoting world trade and international business relationships."  TESS, U.S. Service Mark Registration 1,011,720 (December 17, 2018, 10:25 a.m.), http://tmsearch.uspto.gov/bin/showfield?f=doc&state=4802:9nr4pz.4.1; see Food Mktg. Merch., Inc. v. California Milk Processor Bd., No. 15 CV 1758 LAK, 2015 WL 3893508, at *1 n.2 (S.D.N.Y. May 7, 2015) (taking judicial notice of the existence of multiple trademarks based on the TESS database).

the Licensed Marks, Licensor specifications for use of the marks, a covenant that the Licensed

Marks are WTCA's property, and an integration clause stating that the License "embodies the

entire agreement and understanding" between the parties "with respect to the Licensed Marks."

(Id. ¶ 9.)  Defendant asserts that the 1986 License is a standard form membership-type agreement

that all WTCA members execute.  (Def. 56.1 St. ¶ 153; see also Pl. 56.1 Resp. ¶ 153 (disputing

whether a standard agreement existed at the time the 1986 License was executed because the

Port Authority and the Washington, D.C., WTCA member were the first to execute such an

agreement).)  Both the Port Authority and WTCA relied on Lee Robinson of Curtis, Morris &

Safford, P.C. ("Licensing Counsel") for drafting and advice in connection with these agreements.

(Def. 56.1 St. ¶ 118.)

On September 24, 1986, WTCA filed an application with the United States Patent

and Trademark Office ("PTO") for the registration of a "WORLD TRADE CENTER" service

mark for "association services," "namely, fostering and promoting world trade and international

business relationships."  (Federal Service Mark Application, Docket Entry No. 149-22, at 1-2.)

The application claims a March 1961 date of first use of the mark.  (Id. at 1.)  The application

further states that the Port of New York Authority (now the Port Authority), which the

application characterizes as WTCA's predecessor, made first use of the mark in interstate

commerce for the sale or advertising of services and that WTCA continues to use the mark for

services.  (Id. at 2-3.)  That application, which was signed by Tozzoli as WCTA's president, also

represented that "to the best of [Tozzoli's] knowledge and belief no other person, firm,

corporation or association has the right to use said mark in commerce, either in the identical form

or in such near resemblance thereto as may be likely, when applied to the services of such other

person, to cause confusion, or cause mistake, or to deceive; [and] that said mark has been used

substantially exclusively and continuously by applicant for said services in interstate commerce

for at least the five years next proceeding [sic] the date of this application and has become

distinctive of applicant's services in such commerce." (Id. at 3-4.) The registration was granted

on February 12, 1996 as trademark number 1,469,489. (Federal Service Mark Registration,

Docket Entry No. 149-23.) At the time of the application, WTCA was aware of several WTCA

members that had used the World Trade Center name prior to WTCA's incorporation, some as

early as 1963, including New Orleans, San Francisco, Boston, San Diego, and Houston. (Def.

56.1 St. ¶¶ 126, 164; Pl. 56.1 Resp. ¶ 164; see WTCA Board Minutes for January 26, 1970

Meeting, Ewing Reply Decl. in Supp. of Pl.'s Mot. for Partial Summ. J., Ex. 136, at

PANYNJ00333215-6 (demonstrating the WCTA membership of the aforementioned WTCs as of

the date of the meeting).) During the preparation of the application, Kearney noted that he felt

"uncomfortable" about applying for a federal service mark. (Def. 56.1 St. ¶ 124; see Pl. 56.1

Resp. ¶ 124.)

      In 1987, Tozzoli retired from the Port Authority and became the first full-time

president of WTCA, an office in which he served until February 2012. (Pl. 56.1 St. ¶ 52.) Port

Authority employees continued to serve on WTCA's board until 1996. (Id. ¶ 53; see Def. 56.1

Resp. ¶ 53.)

      On July 24, 2001, the Port Authority executed a set of "net lease" transactions

whereby it leased 1, 2, 3, 4, and 5 World Trade Center to corresponding single-purpose entities

controlled by the Silverstein Group ("Silverstein") and leased the complex's mall to a single-

purpose entity controlled by Westfield America, Inc. (Def. 56.1 St. ¶¶ 47-50, 52.) Each single-

purpose entity, except the entity leasing 3 World Trade Center, signed a separate trademark

license with Plaintiff WTCA on July 24, 2001 (collectively, the "2001 Licenses"). (Pl. 56.1 St. ¶

93.)  Concurrently with this transaction WTCA sub-leased office space from the Port Authority and both parties executed a letter (the "2001 Letter") which confirmed the Port Authority's rights under the 1986 Assignment to use the WORLD TRADE CENTER or WTC service marks royalty free and sublicense them as contemplated by the assignment.  (Def. 56.1 St. ¶¶ 197-198.) Both parties agree that this letter constituted a binding agreement.  (Id.)

Following the catastrophic attacks of September 11, 2001, the entire NYWTC complex was destroyed.  (Def. 56.1 St. ¶ 53.)  As part of the redevelopment effort for the site, the Port Authority determined that Silverstein would reconstruct and retain the net leases on future Towers 2, 3, and 4 through its existing single-purpose entities.  (Id. ¶ 59.)  The Port Authority, however,  acquired One World Trade Center LLC ("1 WTC LLC"), the single-purpose entity holding the net lease for the future One World Trade Center tower, from Silverstein.  (Id.)  Upon its acquisition of 1 WTC LLC, the Port Authority became the sole managing member of that entity. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████

On November 16, 2006, WTCA, as "Licensor," entered into an Amended and Restated Trademark License Agreement (the "2006 Agreement," Docket Entry No. 149-56) with 1 WTC LLC, "a limited liability company having an office and place of business c/o the Port Authority," as "Licensee."  The Agreement recited the 2001 original leasing arrangement between the Port Authority and 1 WTC LLC, the entities' entry in to an amended and restated lease following the destruction of the original towers, and that "Licensee desires to license from

Licensor and Licensor desires to license to Licensee the right to use certain Marks (as herein defined) owned by Licensor in connection with the operation of the Premises, on certain terms and conditions more specifically set forth herein." The 2006 Agreement defined "Marks" as the "terms and/or designations (including word marks, logo marks, and names, as appropriate) 'WORLD TRADE CENTER', 'WTC', and the Map Design Logo," and granted a non-exclusive license to 1 WTC LLC for use of the Marks, subject to several restrictions, including a requirement for Licensor approval of any changes in the form of use of the marks, and prohibitions on combining the licensed marks with other terms (co-branding) or affixing the marks to goods without Plaintiff's permission. (Id. §§ (I)(A)(11), (II)(B), (II)(B)(2); (II)(B)(5).) The agreement contained the following signature block for 1 WTC LLC, which was signed by Michael B. Francois:

> Licensee:
>
> 1 WORLD TRADE CENTER LLC
>
> By:    The Port Authority of New York and New Jersey
>
> By:    _____[Original Signed by Michael B. Francois]_____
> Name:  Michael B. Francois_____
> Its:   Director of Development_____

(Id. at WTCA_0001125.) The 2006 Agreement contained no space for the Port Authority to sign in its own name. The 2006 Agreement contains separate definitions for the terms "Licensee," which refers to 1 WTC LLC, and "Port Authority." (Id. §§ (I)(A)(9), (17).)

The Port Authority, along with its outside counsel, DLA Piper, LLP, negotiated the 2006 Agreement on 1 WTC LLC's behalf.  (Pl. 56.1 St. ¶ 105; <u>see</u> Def. 56.1 Resp. ¶ 105 (disputing the extent of Defendant's involvement in negotiations).)

In 2011 and 2012, WTCA filed several intent to use trademark applications with the PTO, seeking trademark registration of both WORLD TRADE CENTER and WTC for use in connection with the sale of a wide variety of goods including, but not limited to, clothing, books, postcards, bags, purses, and architectural models.  (Def. 56.1 St. ¶¶ 304-307, 311.)  ███████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████

In May 2011, 1 WTC LLC assigned its net lease and its intellectual property rights under the 2006 Agreement to WTC Tower 1 LLC, in anticipation of the formation of a joint venture by the Port Authority and the Durst Organization ("Durst"), which would own and

manage that new single-purpose entity.[3]  (Def. 56.1 St. ¶ 72; Def. 56.1 Resp. ¶ 117; see Pl. 56.1

Resp. ¶ 72.)



In 2013, WTC Tower 1 LLC contracted with Legends Hospitality LLC

("Legends") to lease and operate the observation deck at the rebuilt One World Trade Center.

(Def. 56.1 St. ¶ 87; see Def. 56.1 St. ¶ 87.)

---

[3]     Membership and control of WTC Tower 1 LLC was transferred from Port Authority to the joint venture in June 2011.  (Def. 56.1 ¶¶ 73-75.)  Durst manages the day to day affairs of the Joint Venture, but "Major Decisions" under the Joint Venture agreement require unanimous approval by the Port Authority entity Joint Venture member and the Durst entity Joint Venture member.  (Def. 56.1 ¶ 75.)

[4]     It appears, based on the parties' evidentiary proffers, that WTC Tower 1 LLC had already assumed the 2006 Agreement from 1 WTC LLC at this point.  (See Pl.'s 56.1 St. ¶ 117.)

███████████████████████████████████████████████

███████████████████████████████████████████████

██ In October 2014, Legends announced its observation deck logo, which included a combination of the terms "One World Observatory" and "One World Trade Center."  (Def. 56.1 St. ¶¶ 88-89.)  The observation deck, where visitors can purchase souvenirs bearing the term "One World Trade Center" and the name of the observatory, opened in May 2015.  (Id. ¶ 90; see Pl. 56.1 Resp. ¶ 90.)  It is undisputed that WTCA did not grant permission for these activities as purportedly required under the 1986 License and 2006 Agreement.  (Pl. 56.1 St. ¶ 149.)

In the context of discovery for this action, the Port Authority produced documents in its possession from 1 WTC LLC and WTC Tower 1 LLC and produced a Port Authority employee to appear as a Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") witness "regarding 1 [WTC] LLC and WTC Tower 1 LLC."  (Pl. 56.1 St. ¶¶ 159-160; but see Def. 56.1 Resp. ¶¶ 159-160 (noting that Rule 30(b)(6) notice was only served on the Port Authority, not on either single-purpose entity, and admitting that that it produced documents related to the single-purpose entities in its possession); Ewing Decl. Docket Entry No. 149, ¶ 78.)

## II. DISCUSSION

### A. Sovereign Immunity (9th Affirmative Defense)

While each party makes extensive arguments as to why it is entitled to summary judgment on the merits of the various claims, the Court must first consider the Port Authority's contention that the Court lacks jurisdiction, due to sovereign immunity, to consider WTCA's claims for injunctive relief and specific performance.  In the Amended Complaint, WTCA pleads its entitlement to injunctive relief barring, inter alia, the Port Authority's use of the disputed marks in connection with the sale of goods, the use of such marks for any goods or services

outside the scope of the relevant license agreements, and barring the Port Authority and all acting in concert with it from taking or continuing "actions inconsistent with WCTA's sole and exclusive ownership of the WORLD TRADE CENTER, WTC, WORLD TRADE CENTERS ASSOCIATION and WTCA marks." (Am. Compl. at 14-15.) WTCA further seeks injunctive relief barring the Port Authority, its affiliates, and those acting in concert with it "from breaching the 1986 or 2006 Licensing Agreements and directing them to specifically perform their obligations under such contracts," in addition to a declaration that the Port Authority is bound by the restrictions contained in those agreements that prohibit the use of the WORLD TRADE CENTER and WTC trademarks on goods without WTCA's consent. (Id. at 14-15, ¶ 54.)

Defendant Port Authority contends that Plaintiff's injunctive relief and specific performance claims against it are barred by the doctrine of sovereign immunity. A court lacks subject matter jurisdiction to hear an action against a sovereign or its instrumentalities unless the sovereign has waived its immunity with respect to the claim at issue. C.H. Sanders Co. v. BHAP Housing Dev. Fund Co., 903 F.2d 114, 117 (2d Cir. 1990). "[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Lane v. Pena, 518 U.S. 187, 192 (1996).

Defendant argues that the laws of New York, which in conjunction with a complementary New Jersey statute, govern suits against the Port Authority, do not provide a waiver of sovereign immunity for actions seeking injunctive relief and specific performance.[5] N.Y. Unconsol. Law §§ 7101 et seq. (McKinney); see also N.J. Stat. Ann. §§ 32:1-157 et seq. Under these statutes, New York and New Jersey have consented to permit all "suits, actions or

---

[5]     Plaintiff does not seek damages, which would be barred unless Plaintiff timely filed a notice of claim with the Port Authority. N.Y. Unconsol. Law § 7107 (McKinney).

proceedings of any form or nature at law, in equity, or otherwise" against the Port Authority, except as specifically prohibited by the statute.  N.Y. Unconsol. Law §§ 7101 (McKinney) ("Section 7101"); see also N.J. Stat. Ann. §§ 32:1-157.  Excepted from this waiver of sovereign immunity are "suits, actions or proceedings for judgments, orders or decrees restraining, enjoining or preventing the Port Authority from committing or continuing any acts" unless such measures are commenced by the attorney general of New York or New Jersey.  N.Y. Unconsol. Law § 7105 (McKinney) ("Section 7105"); see also Caceres v. Port Auth., 631 F.3d 620, 624 (2d Cir. 2011) (finding that the aforementioned state statutes constitute waivers of sovereign immunity and are, therefore, jurisdictional.).

      Pursuant to the Eleventh Amendment to the Constitution of the United States, states and their agencies are generally shielded from suits that have been brought in federal court without their consent.  See Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 39 (1994).  However, in Hess v. Port Authority Trans-Hudson Corp., the Supreme Court held that the Port Authority, a financially self-sustaining entity created by the United States, New York, and New Jersey pursuant to the Compacts Clause of the Constitution, was not protected by Eleventh Amendment immunity against a Federal Employers' Liability Act claim for damages brought outside the one-year period provided for in the relevant state statutes, because a judgment on that claim would not contravene the purposes of the Eleventh Amendment by drawing on the treasury or offending the sovereign dignity of either state.  Id., 513 U.S at 47-53.  Hess is binding on this Court, and thus requires rejection of the 9th Affirmative Defense to the extent Plaintiff's claims arise under the federal Lanham Act.  WTCA's Lanham Act Claims against the Port Authority are not barred by the Eleventh Amendment.

As to WTCA's state law claims, however, "Federal courts apply the general rule that state [sovereign immunity] statutes apply to state law claims." Kyne v. Carl Beiber Bus. Servs., 147 F. Supp. 2d 215, 217 (S.D.N.Y. 2001); see also Caceres, 631 F.3d at 625 (Although the Supreme Court's Hess decision precludes the Port Authority's sovereign immunity defense against federal claims, its "holding does not bear upon the validity of conditions for waiving sovereign immunity over claims arising under state law."). Because Section 7105 explicitly prohibits, except in narrow circumstances not pertinent here, suits seeking to enjoin the Port Authority, Plaintiff's state law claims (3rd through 6th Claims for Relief) are barred to the extent they seek such relief. See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.").

Plaintiff contends that Section 7105's exception to the waiver of sovereign immunity, prohibiting suit against the Port Authority for injunctive relief, does not extend to specific performance of a contract or agreement, a remedy that Plaintiff argues is subject to different standards than a permanent or preliminary injunction. Courts, however, have classified specific performance as an injunctive remedy, and this Court is bound to strictly construe any waiver of sovereign immunity in favor of the Port Authority.[6] See Petrello v. White, 533 F.3d 110, 114-15 (2d Cir. 2008) ("[W]e have little doubt that if a given specific-performance order is injunctive in character, it would be" appealable to the same extent as an injunction.); see also Lane, 518 U.S. at 192 ("[A] waiver of the Government's sovereign immunity will be strictly

---

[6]  Plaintiff also argues that the Port Authority consented to suit through its execution of the 2006 License but, as explained below, Defendant was not party to that agreement and it therefore cannot provide the basis for a finding of a contractual waiver of sovereign immunity.

construed, in terms of its scope, in favor of the sovereign.").  The Court therefore construes

Section 7105 as barring private entity actions for specific performance.  Furthermore, the plain

language of Section 7105 prohibits courts from entering orders that "prevent[] the port authority

from committing or continuing any acts."  This restriction would preclude an order of specific

performance to remedy breach of a contract.

Plaintiff contends that its 7th Claim for Relief, which seeks a declaration that the

Port Authority is bound by the 1986 License and 2006 Agreement and that it is consequently

barred from selling goods bearing the WTC or WORLD TRADE CENTER MARK without

WTCA's permission, is not precluded by sovereign immunity.[7]  Although waivers of sovereign

immunity must be construed narrowly, Section 7101 provides an unambiguously broad waiver of

sovereign immunity for all claims against the Port Authority except for those specifically

reserved by statute.  Because no party has identified, and the Court's own research has not

disclosed, any statutory provision that can be construed to prohibit a suit for declaratory relief

against the Port Authority, the Court has jurisdiction of Plaintiff's state law claim (7th Claim for

Relief) seeking declaratory relief.[8]

Accordingly, the Court dismisses all of Plaintiff's claims brought under state law

(3rd through 6th Claims for Relief) except the declaratory judgment claim (7th Claim for Relief),

denies Plaintiff's motion for summary judgment on Plaintiff's 6th Claim for Relief for breach of

contract and Plaintiff's motion to strike Defendant's 9th Affirmative Defense as to claims brought

---

[7]  This Claim for Relief appears to be grounded in state contract law.

[8]  Plaintiff contends that because it may seek declaratory relief on its state law claims, it may also seek injunctive relief to enforce any such declarations.  Section 7105 would, however, prohibit any such injunction.  Thus the Court has no subject matter jurisdiction to entertain any injunctive aspect of Plaintiff's 7th Claim for Relief.

under state law, grants Plaintiff's motion for summary judgment striking the Port Authority's 9th Affirmative Defense with respect to Plaintiff's federal law claims (1st and 2nd Claims for Relief) and, denies Defendant's jurisdictional motion for summary judgment dismissing Plaintiff's cause of action for a declaration that the Port Authority is bound be the restrictions contained in the 1986 License and 2006 Agreement (7th Claim for Relief).

B. Merits

    1. Summary Judgment Standard

        The pending motions are brought pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Under Rule 56(a), summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of material issues of fact, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986), and the court must be able to find that, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." Marvel Entertainment, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d 520, 523 (S.D.N.Y.2011) (quoting Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted). A fact is considered material "if it might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (internal quotation marks and citations omitted). "[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted). When considering cross-motions

for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." <u>Schwabenbauer v. Board of Educ. of City School Dist. of City of Olean</u>, 667 F.2d 305, 314 (2d Cir. 1981).

    2.   <u>Trademark Infringement and Breach of the Governing Contracts (1st, 2nd, and 7th Claims for Relief and 1st and 2nd Counterclaims)</u>

        Plaintiff WCTA asserts in its 1st and 2nd Claims for Relief that the Port Authority's use of the WORLD TRADE CENTER and WTC marks infringes upon WTCA's ownership rights in those marks, and represents a breach of the contracts purportedly governing use of those marks. The Port Authority's 1st Counterclaim seeks a declaration that WTCA lacks sufficient rights in the WORLD TRADE CENTER and WTC marks to "permit [WTCA] to interfere with the Port Authority's use of the Marks in connection with goods or services offered at or in connection with the World Trade Center site," contending that the WTCA has abandoned the rights it claims, that the Port Authority's use is consistent with its reserved rights, and, alternatively, that Port Authority's use is "fair use" under the Lanham Act. In its 2nd Counterclaim, the Port Authority asserts that it has reserved the relevant rights and complied with any applicable licenses or agreements, and that WTCA's licenses are invalid and/or unenforceable against the Port Authority. On the instant motion practice, the Port Authority seeks summary judgment dismissing Plaintiff's 1st, 2nd, and 7th Claims for Relief, as well as summary judgment in its own favor on the 1st and 2nd Counterclaims. The WCTA seeks dismissal of the Port Authority's 2nd Counterclaim.

To succeed on a claim of trademark infringement or unfair competition[9] and false designation of origin under the Lanham Act, a plaintiff must establish that it possesses "a valid mark that is entitled to protection and that the defendant's actions are likely to cause confusion with the plaintiff's mark."  Gameologist Group, LLC v. Sci. Games Int'l, Inc., 838 F. Supp. 2d 141, 152 (S.D.N.Y. 2011), aff'd, 508 F. App'x 31 (2d Cir. 2013).

Plaintiff contends that it acquired all relevant WTC and WORLD TRADE CENTER-related service and trademarks through the 1986 Assignment and that the Port Authority has breached the 1986 License and 2006 Agreement, which purportedly govern the Port Authority's use of the marks, and thus has infringed WCTA's intellectual property rights by combining, or authorizing Legends to combine, the term "World Trade Center" with "One World Observatory" in a logo and by sublicensing the WTC marks for use on merchandise without Plaintiff's consent.  (Am. Compl. ¶ 27; Pl.'s Mem of Law in Supp. of Mot. for Partial Summ. J., Docket Entry No. 147, at 24-25.)  Defendant principally contends that it assigned only the specified service marks, rather than rights in trademarks for use in connection with sales of goods, under the 1986 Assignment, and thus is not restricted by the 1986 License in its trademark use of the terms WORLD TRADE CENTER and WTC.  The Port Authority further asserts that it is not party to the 2006 Agreement, which by its terms prohibits WTCA's counterparties from authorizing the use of the WORLD TRADE CENTER or WTC marks on goods or the combination of the marks with other marks to designate goods or services.

---

[9]	An unfair competition claim under New York law includes the additional element of bad faith.  See Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers, 894 F. Supp. 2d 288, 325-26 (S.D.N.Y. 2012).

As noted above, Plaintiff claims that it acquired ownership of all WORLD TRADE CENTER and WTC marks for trademark purposes under the 1986 Assignment, which is also the only evidence in the record of a purported transfer of rights (as opposed to grants of licenses) in either mark.[10]

    a. <u>1986 Assignment</u>

There is no dispute that the 1986 Assignment conveyed rights from the Port Authority to WCTA. The first issue for examination on this motion practice is the nature and scope of the rights that were conveyed. When "contractual language is ambiguous and subject to varying reasonable interpretations, intent becomes an issue of fact and summary judgment is inappropriate." <u>Thompson v. Gjivoje, 896 F.2d 716</u>, 721 (2d Cir. 1990) (citation omitted). Where, however, the language is unambiguous, the district court may construe it as a matter of law and grant summary judgment accordingly. <u>Id.</u>; <u>Krumme v. WestPoint Stevens Inc.</u>, 238 F.3d 133, 138 (2d Cir. 2000) ("[T]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous."). "[I]f an agreement is 'complete, clear and unambiguous on its face [, it] must be enforced according to the plain meaning of its terms.'" <u>Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 177-78 (2d Cir. 2004) (citation omitted) (second alteration in original).

As a threshold matter, Defendant has produced uncontroverted evidence that it has used or licensed (to Ogden and, after the post-9/11 reconstruction, Legends) WORLD TRADE CENTER and WTC as a trademark for goods sold at the NYWTC gift shop since at

---

[10]     No document in the record explicitly purports to transfer any rights in the mark "WTC" and there is no proffer of testimony concerning an explicit oral transfer of such rights, although Plaintiff argues that ownership of the WORLD TRADE CENTER mark carries with it ownership of the short form composed of the initials of the component words.

least 1975.  As Plaintiff has produced no evidence that it, rather than the Port Authority, used the trademark in commerce first, any rights in the trademark originate with Defendant, at least with respect to such use for goods sold at or in connection with the NYWTC.  See Blue Planet Software, Inc. v. Games Int'l, LLC, 334 F. Supp. 2d 425, 436-37 (S.D.N.Y. 2004) (stating that common law trademark rights attach based on a mark's first use in commerce) and cases cited therein.

Here, the assignment purports to transfer title "in and to said service mark WORLD TRADE CENTER, said service mark registrations, and the good will of PORT AUTHORITY's business in the services in respect of which the mark is used." (1986 Assignment (emphasis added).)  An introductory recital states that Defendant "has adopted and used the service mark WORLD TRADE CENTER, for which it has obtained" two Argentine and six New York service mark registrations for various services.  (Id.)  Although it was entered into at a time when Defendant was already selling or licensing sales of trademarked merchandise, the agreement unambiguously provides for the transfer of Defendant's intellectual property in connection with services only.  The assignment repeatedly employs the term "service mark" and specifically purports to transfer Defendant's goodwill only with respect to the services in connection with which the mark is used.  Furthermore, the assigning clause uses the phrase "said service mark," the antecedent of which is clearly the previously referenced "service mark WORLD TRADE CENTER, for which [the Port Authority] ha[d] obtained" the Argentine and New York State service mark registrations enumerated in the recitals that open the agreement. The assignment contains no language from which the Court could rationally infer that the parties intended to transfer any other rights, including those in trademarks affixed to goods.

Plaintiff nonetheless contends that the 1986 Assignment divested the Port Authority of any trademark rights in the WORLD TRADE CENTER mark, arguing that the terms service mark and trademark are synonymous and congruent under the Lanham Act.  <u>See e.g.</u> <u>Dranoff-Perlstein Assocs. v. Sklar</u>, 967 F.2d 852, 855 (3d Cir. 1992); <u>see also</u> 15 U.S.C. § 1053 ("service marks shall be registrable, in the same manner and with the same effect as are trademarks").  Whatever the legal similarities between the two species of marks, the use of the term "service mark," particularly when used in reference to the provision of specific services, is not broad enough to suggest that the parties intended to refer to trademarks affixed to goods.  <u>See</u> 1 Gilson on Trademarks § 1.02[2] (quoting 15 U.S.C. § 1127) (stating that, although "service marks are frequently referred to as trademarks," a mark used as both a trademark and service mark should be referred to simply as a "mark," which term by statute includes any "trademark, service mark, collective mark, or certification mark.") (internal quotation marks omitted).

Plaintiff further argues that an "assignment" must by definition convey all conceivable rights and title in a mark, making the service mark/trademark distinction irrelevant. In support of this proposition, Plaintiff cites <u>Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.</u>, 726 F. 3d 62, 75 (2d Cir. 2013) ("[A]n assignment is an outright sale of all rights in that mark.") (alterations, quotation marks, and citations omitted).  That case did not, however, concern the question of whether the assignment of rights in a service mark necessarily carries with it the assignment of parallel trademark rights.  Rather, the court in <u>SPI Spirits</u> was concerned with the construction of the term "assign" as used in a provision of the Lanham Act that authorizes a trademark registrant or assign to bring an action to enforce the trademark. Finding that the putative grantor in that case had retained title, the right to rescind the trademark, and the right to license it and to exclude others from the mark, the court found that "too many

rights remain[ed] with the [grantor] for it to be deemed to have 'assigned' the Marks to" the plaintiff within the meaning of the statutory standing provision. Id. at 76-77. Plaintiff has not identified any authority that precludes a party from assigning ownership only of particular elements of its intellectual property.

Plaintiff argues that the execution of the 1986 License supports a conclusion that the parties entered into a larger transaction in which the Port Authority granted WTCA broad ownership of all aspects of the WORLD TRADE CENTER and WTC marks, through the 1986 Assignment, and WTCA then licensed back certain rights. To the extent Plaintiff requests that the Court interpret the 1986 Assignment in tandem with the 1986 License based on the proposition that an assignment and contemporaneous license constitute a single transaction, the Court declines to do so. Under New York law, documents "executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction" should be read together. Carvel Corp. v. Diversified Management Group, Inc., 930 F.2d 228, 233 (2d Cir. 1991); see also Visa U.S.A., Inc. v. Birmingham Trust Nat'l Bank, 696 F.2d 1371, 1376-77 (Fed. Cir. 1982) (finding that an assignment and simultaneous license-back arrangement constituted a unitary transaction). The 1986 Agreement and the 1986 License do not meet these criteria. The fact that these documents were executed about two weeks apart, rather than at the same time, the inclusion of an integration clause in the 1986 License, and the lack of any cross-references between the two documents foreclose any reasonable inference that the parties intended the license and assignment to be read in conjunction with one another as the documentation of a

unitary transaction.[11][12]  See In re Gulf Oil/Cities Service Tender Offer Lit., 725 F. Supp. 712,

731 (S.D.N.Y. 1989) (finding that a set of contracts was composed of distinct agreements based

on, inter alia, the inclusion of an integration clause in each document); cf. Liberty USA Corp. v.

Buyer's Choice Ins. Agency LLC., 386 F. Supp. 2d 421, 426 (S.D.N.Y. 2005) (finding that the

parties intended that an asset purchase agreement and promissory note were to be read as a single

agreement where both documents were executed on the same day, one agreement incorporated

the other by reference, and failure to make payments under the note constituted a breach of the

purchase agreement.); see also Maximilian Coreth, Olivia Bam v. Barclays Capital Inc.(In re

Barclays Capital Inc.), 479 B.R. 268, 279 (S.D.N.Y. 2012), aff'd, 513 F. App'x 75 (2d Cir. 2013)

(finding no ambiguity as to whether the parties intended that two documents be read separately

when they were executed on different dates, did not refer to one another, and addressed

employment terms in two different time periods, despite no one factor being dispositive).

Therefore, as a matter of law, the 1986 Assignment did not function to assign

Defendant's rights in the WORLD TRADE CENTER or WTC trademarks as they pertain to

---

[11]    Even if the Court were to consider the 1986 License to inform its interpretation of the
1986 Assignment, no ambiguity would be introduced.  The license agreement grants
rights to use the "Licensed Marks," a term explicitly defined as the six New York and
two Argentine service marks and the one federal service mark and logo, and thus cannot
reasonably be interpreted to encompass trademarks.  (1986 License Agreement at pg. 1.)

[12]    Plaintiff also argues that, as a party to the 1986 License, Defendant is barred from
challenging the ownership and validity of the marks it licensed from Plaintiff under the
doctrine of licensee estoppel.  See The Martha Graham Sch. & Dance Found, Inc. v.
Martha Graham Center of Contemporary Dance, Inc., 153 F. Supp. 2d 512, 520
(S.D.N.Y. 2001), aff'd, 43 F. App'x 408 (2d Cir. 2002).  Because the 1986 License
unambiguously pertains only to the enumerated service marks as defined in that
document, the doctrine of licensee estoppel does not equitably bar Defendant from
challenging Plaintiff's rights in marks that are not within the scope of the license.

goods to WTCA and, thus, no further licensing agreement could empower WTCA to restrict the Port Authority's use on goods of a trademark that WTCA did not own.

b. 1986 License

WTCA asserts that the Port Authority breached the 1986 License when, without WTCA's consent, it began using the WORLD TRADE CENTER or WTC marks on merchandise for purposes other than "fostering world trade and . . . such additional trade services" and by using such trademarks on a "global basis outside the U.S. in connection with merchandise," outside the geographical scope contemplated by the 1986 License. (1986 License ¶ 1, Ex. A ¶ 1; Am. Compl. ¶¶ 28-29.) The Port Authority does not dispute that it is bound by the 1986 License. However, the agreement only addresses licensing to the Port Authority of "Licensed Marks," which are specifically defined as the six New York- and two Argentina-registered service marks in addition to the federal Map Design Logo and service mark. Because the 1986 License is not susceptible to any reasonable interpretation that would encompass any trademarks and, as previously explained, the 1986 Assignment did not convey any trademark ownership rights, the Port Authority's use of the WORLD TRADE CENTER or WTC legend on merchandise as a trademark could not constitute a breach of the 1986 License. Furthermore, Plaintiff has advanced no argument as to how the use of the trademarks on merchandise is inconsistent with "fostering world trade" nor identified any provision of the license that imposes a geographical scope on the Port Authority's exploitation of even the Licensed Marks. (1986 License Ex. A ¶ 1.)

Accordingly, the Court grants summary judgment in Defendant's favor on its 2nd Counterclaim to the extent the Port Authority seeks a declaration that it is not in breach of the 1986 License, and dismisses WTCA's 7th Claim for Relief to the extent it seeks a declaration that

the Port Authority is bound by the 1986 License to refrain from affixing the relevant trademarks to goods without WTCA's approval.

    c.   <u>2006 Agreement</u>

Plaintiff asserts that the 2006 Agreement prohibits Defendant from affixing the WTC or WORLD TRADE CENTER marks to goods for sale, sublicensing these marks, or combining them with other terms without WTCA's consent. WTCA contends that the Port Authority breached these provisions of the 2006 Agreement by authorizing Legends to co-brand the WORLD TRADE CENTER and WTC service marks with other logos without Plaintiff's consent and authorizing Legends to affix the marks to merchandise offered for sale. Defendant denies that it is bound by the 2006 Agreement, and reiterates its argument that, to the extent the 2006 Agreement purports to govern the use of trademarks on goods, the Port Authority never transferred any ownership rights of such trademarks to WTCA and thus WTCA has no legal right to restrict the use of such marks.

As previously explained, neither the 1986 Assignment nor any other instrument that has been identified in this action effected the transfer to WTCA of the Port Authority's rights to affix any trademarks to goods. Thus, even if the Port Authority were bound by the 2006 Agreement, the Agreement would be inoperative to restrict the Port Authority's use of trademarks that the Port Authority, rather than WTCA, owned. The Court still must, however, examine whether the 2006 Agreement restricted the Port Authority's ability to sublicense the WORLD TRADE CENTER and WTC service marks to Legends and authorize Legends to combine them with other marks.

Defendant asserts that only its subsidiary single-purpose entity, 1 WTC LLC, and later 1 WTC LLC's assignee and successor WTC Tower 1 LLC, are bound by the 2006 Agreement, pointing out that 1 WTC LLC and WTCA are the only named parties to the 2006 Agreement and that the Port Authority, which was the managing member of the special purpose entities, only signed the agreement in its capacity as representative of 1 WTC LLC.  Plaintiff nonetheless argues that the Port Authority is bound by the agreement, citing New York law for the proposition that a parent corporation may be bound to a subsidiary's agreement if the parent demonstrated an intent to be bound by the agreement or if the subsidiary is a dummy corporation or alter ego of the parent.  See MBIA Ins. Corp. v. Royal Bank of Canada, 706 F. Supp. 2d 380, 396-98 (S.D.N.Y. 2009).  Plaintiff contends that Defendant evidenced its intent to be bound by the 2006 Agreement through: (1) its actual execution of the agreement; (2) its allegedly extensive involvement in the negotiation of the agreement; (3) its assumption of the contract through its subsequent conduct; and, alternatively, (4) because 1 WTC LLC and WTC Tower 1 LLC were dummy corporations or alter egos of the Port Authority.

The signature pages of the 2006 Agreement provide no support for the proposition that the Port Authority intended to be bound to that contract.  The identification on the signature page of 1 WTC LLC as licensor, followed by the phrase "by [the Port Authority],"and then "by" Francois, the Port Authority's Director of Development and accompanied by his signature, clearly evidences that the Port Authority executed the document in its representative capacity as 1 WTC LLC's sole member and managing member. See eBC, Inc. v. Map Techs., LLC, No. 09 CV 10357 CS, 2011 WL 12847702, at *4-5 (S.D.N.Y. May 17, 2011).  Furthermore, the 2006 Agreement explicitly defines the licensee as 1 WTC LLC and includes a separate definition for Defendant as "[t]he Port Authority of New York and New Jersey."  (2006 Agreement §§

(I)(A)(9), (17).)  Accordingly, the Court finds that Defendant has demonstrated that no reasonable jury could conclude that Defendant executed the 2006 Agreement on its own behalf.[13]

Plaintiff next points to evidence that Defendant's agents, including its outside counsel, negotiated the 2006 Agreement, which Plaintiff contends constitutes evidence that Defendant intended to be bound by the agreement.  Although the parties disagree on the extent of Defendant's involvement in negotiations, the Port Authority's actions in connection with such negotiations, through its employees and agents, is insufficient, without more, to enable a reasonable jury to infer that the Port Authority intended to be bound by the agreement to the same extent as the single-purpose subsidiary for which the Port Authority acted.  ████████

████████████████████████████████████████

██████████████████████████████ acts, it must by necessity do so through the manager entity, which as a non-corporeal entity must itself act through its human agents.  N.Y. Limited Liability Company Law §§ 102(p), (q), (w) (stating that a person, which by definition includes various corporate entities, may be a member or manager of an LLC); cf. Capricorn Inv'rs III, L.P. v. Coolbrands Int'l, Inc., 897 N.Y.S.2d 668, 24 Misc. 3d 1224(A), at *6, (Sup. Ct.), aff'd, 886 N.Y.S.2d 158 (App. Div. 2009) (stating that, in conducting an alter ego analysis, an LLC's limitation of liability should not be pierced for the lack of its own officers or staff or the failure to abide corporate formalities not required by the operating agreement); see also Kirschner v. KPMG LLP, 15 N.Y.3d 446, 465 (2010) (Because corporate principals "are not natural persons[,] . . . they must act solely through the instrumentality of their

---

[13]    Plaintiff attempts to distinguish eBC from the present case based on the fact that the representative signatory that the plaintiff sought to hold liable in that case was a natural person rather than another corporate entity.  2011 WL 12847702, at *2.  The Court finds no reason why an entity signing in a representative capacity should be treated any differently.

officers or other duly authorized agents.") (alterations, citations, and internal quotation marks omitted).  To allow a parent entity to become bound to a subsidiary LLC's contract simply because it negotiated the contract through its agents, in its status as manager, would essentially eviscerate the principle of limited liability established by New York law, exposing all LLC managers, whether they are other business entities or natural persons, to personal liability for actions undertaken on behalf of the company.  See N.Y. Limited Liability Company Law § 609(a) ("Neither a member . . . [nor] manager of a limited liability company . . . is liable for any debts, obligations or liabilities of the . . . company . . . solely by reason of being such member, manager or agent or acting (or omitting to act) in such capacities or participating . . . in the conduct of the business of the limited liability company.")  Here, Plaintiff has proffered no evidence beyond Port Authority's alleged participation in the negotiations, attributable to its role as 1 WTC LLC's manager, that would permit a jury to infer its intent to be bound by the contract at the time of its execution; any such inference would be rank speculation and is insufficient to frame a disputed issue of material fact.

Plaintiff next asserts that Defendant's conduct subsequent to the execution of the 2006 Agreement indicates that it intended to assume its subsidiaries' obligation under that contract.  See Silverberg v. SML Acquisition LLC, No. 15-CV-7129 (CS), 2017 WL 758520, at *6 (S.D.N.Y. Feb. 27, 2017) (finding that a managing member of a subsidiary LLC demonstrated its intent to be bound to the subsidiary's contract when it began making payments required under that contract).  ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████



<u>Cf.</u> <u>Malmsteeen v. Universal Music Group, Inc.</u>, 940 F. Supp. 2d. 123, 136 (S.D.N.Y. 2013) (finding that the fact that employees of a subsidiary referred to their employer by the parent entity's name was insufficient to create a genuine issue of material fact as to whether the parent controlled the subsidiary for its own purposes in the context of an alter ego analysis). ████████████████████████████████████████████████████ ██████████████████████████████ Thus Plaintiff has not met its burden of raising a genuine issue of fact as to whether Defendant intended to assume 1 WTC LLC's, and later WTC Tower 1 LLC's, obligations under the 2006 Agreement.[14]

Finally, Plaintiff asserts that Defendant can properly be treated as a party to the 2006 Agreement because 1 WTC LLC and WTC Tower 1 LLC are Defendant's alter egos or mere dummy entities, and the Court would thus be justified in lifting their veil to impute the contractual liability of these special purpose entities to the Port Authority. <u>See Horsehead</u>

---

[14]    Plaintiff also cites a report by a consultant retained by the Port Authority that recites that the Port Authority has a merchandise licensing agreement with Plaintiff. (Ewing Dec. in Supp. of Pl.'s Mot. for Partial Summ. J., Ex. 58, at PANYNJ0089411). The report is hearsay and is thus inadmissible for the truth of the matter asserted. Because no documents or testimony in the record evidence the existence of such an agreement, the hearsay reference in the report raises no genuine fact issue as to Defendant's contractual obligations. Fed. R. Evid. 801(c), 802.

Indus., Inc. v. Metallgesellschaft AG, 239 A.D.2d 171, 172 (App. Div. 1997). To warrant the disregard of the corporate form and a finding that a corporate parent is bound to a subsidiary entity's contract, Plaintiff bears a heavy burden of demonstrating that the Defendant dominated the signatory subsidiary and that such domination "led to inequity, fraud or malfeasance."[15] TNS Holdings Inc. v. MKI Sec. Corp., 92 N.Y.2d 335, 339-40 (1998); see also Print By Premier LLC v. Emigrant Bancorp, Inc., 212 N.Y. Slip Op 31795(U), at *4-5 (Sup. Ct. July 10, 2012). To determine whether a parent has exerted sufficient control to dominate its subsidiary, courts will examine a variety of factors, including: "(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation

---

[15]  Plaintiff relies in this regard on a statement by the Appellate Division in Horsehead Industries., a brief memorandum opinion addressing the validity of a cause of action for breach of contract, that a non-party may be bound if the subsidiary "is a dummy for the parent, or if the subsidiary is controlled by the parent for the parent's own purposes." 239 A.D.2d at 172. The Court finds unpersuasive Plaintiff's suggestion that Horsehead Industries supports the proposition that a mere characterization of an entity as a "dummy," without scrutiny of the traditional criteria for piercing the corporate veil, can properly suffice to support an inference of parent liability. Indeed in Horsehead Industries, the court assumed the truth of the allegations in the underlying complaint that the subsidiary performed no functions other than to hold shares upon which the plaintiff would have had a right of first refusal had they been held directly by the defendant corporation. The parent had also negotiated the sale agreement that was allegedly evasive of the right of first refusal condition. Id. at 171. The Horsehead Industries court's attention to the purpose served by the subsidiary and the parent's relationship to the challenged transaction and its consequences is entirely consistent with traditional alter ego analysis, which the Court now applies in determining whether Plaintiff has raised a genuine issue of fact as to alter ego lability in this case.

at arms[-]length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." Wm. Passalacqua Builders v. Resnick Developers S., 933 F.2d 131, 139 (2d Cir. 1991).

Here, Plaintiff points to the fact that neither 1 WTC LLC nor WTC Tower 1 LLC have employees or directors of their own, and that Port Authority employees transact business and maintain files on their behalf, as evidence of domination and control. Plaintiff also argues that, in the instant action, the Port Authority's claim of privilege over the documents of its subsidiaries, Defendant's production of documents belonging to 1 WTC LLC and WTC Tower 1 LLC bearing the same sequence of Bates numbers as its own evidence, and the use of a Port Authority employee as the Rule 30(b)(6) witness for both single-purpose entities demonstrate that Defendant does not distinguish between itself and its subsidiaries.

All of the cited facts are consistent with Defendant's status as the managing member of the special purpose entities, and thus are not indicative of abuse of the LLC form or of fraud that would warrant treatment of either special purpose entity as an alter ego of the Port Authority. Although Defendant had complete control over 1 WTC LLC as its sole member and manager, such an arrangement for the governance of a closely-held corporate entity is not uncommon and thus represents a neutral factor in the alter ego analysis.[16] See In re Stamou, No. 8-09-78895 REG, 2013 WL 209473, at *11 (Bankr. E.D.N.Y. Jan. 17, 2013) (finding that the

---

[16]    Because that the fact Defendant exercised complete control over 1 WTC LLC does not support piercing the corporate veil, the Court need not specifically address Defendant's arguments regarding the lessened control it exerted over WTC Tower 1 LLC owing to its joint venture arrangement with Durst.

fact that an individual was the "sole member, manager, and employee" of a closely-held entity did not weigh in favor of piercing the corporate veil.) Furthermore, as previously discussed, where the parent entity of the LLC is also appointed as the manager, the use of employees or other agents of the parent entity may be necessary to permit the parent to conduct business on its behalf. Similarly, 1 WTC LLC and WTC Tower 1 LLC's lack of directors and failure to observe other corporate-type formalities are not significant, where, as here, the entity's governance structure does not require such formalities. See Capricorn, 24 Misc. 3d 1224(A), at *6.

Producing a Port Authority employee as the Rule 30(b)(6) witness is also necessary where the subsidiary employs no agents in its own name and is owned and managed by the Port Authority, which like any other corporate entity is unable to testify except through a human agent. The production of documents related to the special purpose entities by Port Authority's counsel in discovery and ███████████████████████ are also insufficient to demonstrate that they constitute Defendant's alter egos. See Robilotto v. Abyssinian Dev. Corp., 2016 N.Y. Slip Op. 30057(U), at *11 (Sup. Ct. Jan. 11, 2016) (finding that allegations of shared phone numbers, email accounts, and offices were insufficient to state a claim that the subsidiary was the parent's alter ego); see also Malmsteeen, 940 F. Supp. 2d. at 136 (finding that the fact that employees of subsidiary referred to their employer by the parent entity's name, was insufficient to create a genuine issue of material fact as to whether the parent controlled the subsidiary for its own purposes). Nor has Plaintiff produced any evidence that demonstrates that 1 WTC LLC or WTC Tower 1 LLC were undercapitalized or that the Port Authority used their property as its own. Moreover, Plaintiff has not articulated any theory as to how this corporate arrangement furthered any fraud, inequity, or malfeasance. See TNS, 92 N.Y.2d 335 at 339-40.

Plaintiff is thus unable to carry its burden of establishing that Defendant is bound by the 2006 Agreement,[17] which restricts co-branding of the WORLD TRADE CENTER or WTC service mark and use of the trademarks on goods without WTCA's permission. Even if Plaintiff could demonstrate that Defendant was party to the 2006 Agreement, Plaintiff has failed to demonstrate that the Port Authority assigned to Plaintiff the Port Authority's rights to any trademark affixed to goods through the execution of 1986 Assignment and, thus, that WTCA could control the use of the relevant trademarks affixed to goods.

The Court grants summary judgment dismissing Plaintiff's infringement and unfair competition claims (1st and 2nd Claims for Relief) based on the rights and duties Plaintiff asserts were established by the relevant documents. Correspondingly, the Court grants summary judgment in favor of Defendant on the Port Authority's counterclaims for a declaration that it neither infringed upon the WTC marks nor breached the 1986 License or the 2006 Agreement (1st and 2nd Counterclaims) and denies Plaintiff's motion for summary judgment dismissing Defendant's 2nd Counterclaim. The Court also grants summary judgment dismissing Plaintiff's 7th Claim for Relief, which seeks a declaration that the Port Authority is bound by the 1986 License and 2006 Agreement to refrain from affixing the relevant marks to goods without WTCA's approval.[18]

---

[17]    Because the Port Authority is not bound by the 2006 Agreement, Defendant is entitled to summary judgment dismissing WTCA's 7th Claim for relief to the extent is seeks a declaration that the Port Authority is required, pursuant to that agreement, to seek WTCA's permission before affixing the WORLD TRADE CENTER or WTCA mark to goods.

[18]    Because the Court dismisses all claims against Defendant, the Court need not address its defense of laches.

3. Port Authority's Ownership Counterclaim (3rd Counterclaim)

Defendant seeks summary judgment in its favor on its counterclaim for a declaration that it owns or has the "right to use and exploit the WORLD TRADE CENTER and WTC Marks at or in connection with all activities at the World Trade Center site in New York without interference from WTCA, and [that it] is the proper owner of certain of the New York State Service Marks for which the goodwill was never transferred to WTCA" because the Port Authority reserved its ownership rights with respect to the NYWTC complex in New York. (Am. Counterclaims ¶ 128.) The Court will examine, separately, the ownership status of and rights to use the service marks that are subject to the 1986 License and the ownership status of and rights to use any trademarks affixed to goods.

As already explained, the 1986 Assignment did not divest Defendant of its rights in the WTC trademarks, but assigned "the entire" right in the WORLD TRADE CENTER service mark and certain New York and Argentine registrations of that mark to Plaintiff, subject to a reservation of rights by the Port Authority. Defendant contends that its reservation of "the right and license to use said service mark for the existing and future services" constituted a reservation of some aspects of ownership of the New York service marks, rather than mere continued permission to make use of them. Specifically, Defendant argues that, because the term "license" grants a privilege to use, the term "right" must be given a broader definition to differentiate it from "license" and avoid rendering the term "right" as surplusage. Defendant points to several definitions of "right" from Black's Law Dictionary, including: (1) "A power, privilege, or immunity secured to a person by law;" (2) "[a] legally enforceable claim that another will do or will not do a given act; a recognized and protected interest the violation of

which is a wrong;" and (3) "[t]he interest claim or ownership that one has in tangible or intangible property." Black's Law Dictionary (10th ed. 2014), right.

Here, reading the Defendant's reservation of rights in the context of the whole document, the Court finds that Defendant unambiguously retained the privilege to continue to use the service mark, but did not retain any ownership rights. Through the assignment, Defendant covenanted to "sell, transfer and convey to WTCA" "the entire right, title and interest in and to said service mark WORLD TRADE CENTER, said service mark registrations and . . . the good will of its business in the services in respect of which the mark is used." (1986 Agreement at 1-2.) Defendant's grant to Plaintiff clearly evinces an intent to transfer ownership, to include title, of the service mark and registrations. Defendant reserved only "the right and license to use" the service marks. (1986 Assignment (emphasis added).) The phase "to use" must modify both the terms "license" and "right," otherwise Defendant would have reserved an undefined "right." Because the reservation clause references Defendant's continued right "to use" the service marks and did not include the same broad affirmative language of ownership that appears in the assignment clause, the Court construes the 1986 Assignment as unambiguously granting all ownership rights in WORLD TRADE CENTER as a service mark, and the corresponding New York- and Argentina-registered service marks, to Plaintiff and granting only a privilege to Defendant to continue to use such marks. See T.G.I. Friday's, Inc. v. Nat'l Restaurants Mgmt., Inc., No. 91 CV 5412 (KMW)(KAR), 1994 WL 419911, at *27 (S.D.N.Y. Aug. 10, 1994), rev'd on other grounds, 59 F.3d 368 (2d Cir. 1995) (finding that a reservation of the "right to use" a mark constituted a license rather than a grant of ownership). Accordingly, Plaintiff's motion for summary judgment is granted to the extent that it seeks dismissal of the aspect of Defendant's 3rd Counterclaim that seeks a declaration that the Port

Authority owns the WORLD TRADE CENTER and WTC service marks. Defendant's corresponding motion for summary judgment on this aspect of the counterclaim is denied.

The Port Authority also requests a declaration that it is entitled to use the WORLD TRADE CENTER and WTC service marks in connection with the NYWTC free from interference by WTCA. This argument is seemingly premised on the assumption that the Port Authority retained ownership of these marks, which as just explained, were actually conveyed to WTCA. Because the Port Authority does not dispute that it is bound by the restrictions in the 1986 License Agreement to the extent WTCA acquired ownership of the service marks, the Port Authority has failed to demonstrate its entitlement to a declaration that it can use of these service marks free from WTCA's interference, as its use of the service marks is subject to the 1986 License.

As to the aspect of Defendant's counterclaim that seeks a declaration that it has the right to use the WORLD TRADE CENTER and WTC trademarks affixed to goods in connection with the NYWTC free from WTCA's interference, the Court finds that Defendant has met its burden of demonstrating its entitlement to summary judgment granting such relief. Because Defendant did not assign its trademark rights to WTCA, Defendant's continuous prior use of the trademark constitutes an effective defense to any attempt by WTCA to enforce its claim of rights in the trademarks on the types of goods that the Port Authority has previously offered or authorized for sale. 15 U.S.C. § 1115(b)(5); Haggar Int'l Corp v. United Co. for Food Industry Corp., 906 F. Supp. 2d 96, 129-130 (S.D.N.Y. 2012) (explaining that the prior use defense requires that a defendant have used the mark continuously and without interruption and that such use must have predated the plaintiff's registration date or date of constructive use). The Port Authority has proffered uncontroverted evidence that it affixed or authorized third

parties to affix the WORLD TRADE CENTER or WTC marks to goods offered for sale at the

NYWTC as souvenirs and other goods prior to any commercial use by WTCA.[19]  Such sales

were interrupted only by the terrorist attack that destroyed the site, after which the complex was

rebuilt and such goods were again offered for sale at the site.  See City of New York v. Tavern

on the Green, L.P., 427 B.R. 233, 242 (S.D.N.Y. 2010) (finding that, under New York law, an

approximately two-year renovation of a restaurant excused any disruption in continuous use of

the mark and, in fact, evidenced an intent to resume such use).  Accordingly, the Court grants

Defendant's request for a declaration that it is entitled to use the WORLD TRADE CENTER and

WTC trademarks consistent with its prior use in connection with the NYWTC without

interference from WTCA.[20]

The Court next examines Defendant's 3rd Counterclaim insofar as it relates to

ownership of WORLD TRADE CENTER and variations on that term as trademarks in

connection with its activities at or relating to the NYWTC.  It is undisputed that the Port

Authority has not registered the term as a trademark.  Common law rights, however, which are

also protected by the Lanham Act and state law, attach to the first party to use a trademark in

commerce.  See Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 117 (2d Cir. 1999) (stating that

the Lanham Act protects common law trademarks); see also Blue Planet, 334 F. Supp. 2d at 437

(stating that common law trademark rights attach based on a mark's first use in commerce).  To

---

[19]     No proffered evidence suggests that WTCA ever made use of WORLD TRADE CENTER or WTC as trademarks, only that it produced some WTCA-branded promotional goods.  (Def. 56.1 St. ¶¶ 264-265.)  The parties proffer images of four items that display WTCA's Map Design Logo and the name of a member WTC, but do not explain WTCA's role in producing or authorizing the production of such goods, the distribution of such goods, or when such goods were produced.  (Id. ¶ 266.)

[20]     For the same reasons, the Court denies Plaintiff's motion for summary judgment striking the Port Authority's prior use defense (7th Affirmative Defense).

establish ownership of a trademark, a party must demonstrate that the mark would qualify for registration, insofar as the mark is "capable of distinguishing the applicant's goods from those of others."  <u>Prof'l Sound Servs. v. Guzzi</u>, 349 F. Supp. 2d 722, 730-31 (S.D.N.Y. 2004), <u>aff'd</u>, 159 F. App'x 270 (2d Cir. 2005) (quoting <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 767 (1992)).  An unregistered mark generally qualifies for registration if it is sufficiently distinctive or has acquired secondary meaning with respect to the particular kinds of goods or use of the mark.[21]  <u>Genesee Brewing Co. v. Srtoh Brewing Co.</u>, 124 F.3d 137, 142-43, 143 n.4 (2d Cir. 1997).

Although Defendant has proffered uncontroverted evidence that it made use of the WORLD TRADE CENTER trademark affixed to goods in commerce in connection with the NYWTC before Plaintiff did, and that it did not assign its rights in the trademark to WCTA, neither party has advanced any evidence or argument as to whether the trademark qualifies for protection as sufficiently distinctive or as having acquired secondary meaning with respect to its relevant use on goods.  The Court therefore denies summary judgment to both parties with respect to this aspect of the counterclaim.  In light of the Court's independent duty to examine subject matter jurisdiction and the Court's determination that WTCA has no ownership interest in WORLD TRADE CENTER or WTC as a trademark affixed to goods, Defendant will be ordered to show cause as to why the Court should not dismiss the aspect of the counterclaim seeking a declaration of ownership by the Port Authority as failing, in light of the Court's finding that WTCA has no relevant rights in the trademark, to present a case in controversy between two

---

[21]     "Under New York law, as under § 43(a) of the Lanham Act, to prevail on a claim for trademark infringement of an unregistered mark, a plaintiff must establish secondary meaning."  <u>Rockland Exposition</u>, 894 F. Supp. 2d at 325 (citing <u>Allied Maint. Corp. v. Allied Mech. Trades, Inc.</u>, 42 N.Y.2d 538 (1977)).

parties that have an adversarial interest in the ownership of the WORLD TRADE CENTER and WTC trademarks on goods.  Fed. R. Civ. P. 12(h)(3); see Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941) (stating that in order to grant declaratory judgment, the Court must find "a substantial controversy, between parties having adverse legal interests").

Accordingly:

(1) Plaintiff's motion for summary judgment is granted, and Defendant's motion is accordingly denied, dismissing Defendant's 3rd Counterclaim insofar as it seeks a declaration that the Port Authority owns or has the right to use without WTCA's interference the WORLD TRADE CENTER or WTC service marks in connection with the NYWTC.

(2) Both parties' motions for summary judgment are denied as to Defendant's general claim of ownership of the WORLD TRADE CENTER and WTC trademarks affixed to goods.  The Port Authority will be ordered to show cause as to why this aspect of its 3rd Counterclaim should not be dismissed for lack of subject matter jurisdiction.

(3) Defendant's motion for summary judgment is granted, and Plaintiff's motion is accordingly denied, with respect to the Port Authority's claim for a declaration stating that the Port Authority is entitled to use the WORLD TRADE CENTER and WTC trademarks affixed to goods in connection with the NYWTC without WTCA's interference, to the extent such particular uses predate any corresponding use by the WTCA.

4.  Petition to Cancel Plaintiff's Federal Service Mark Registration (4th Counterclaim)

In its 4th Counterclaim, Defendant petitions the Court to cancel Plaintiff's federal registration for the WTC service mark (Registration No. 1,469,489) pursuant to section 37 of the Lanham Act, 15 U.S.C. § 1119, which empowers a court to "determine the right to registration,

order the cancelation of registrations, in whole or in part . . . and otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C.S. § 1119 (LexisNexis 2006).  After a mark has been registered and continuously used for five years, however, it becomes incontestable and the registration thus represents conclusive evidence of the validity of the mark, unless one of several enumerated defenses is established, including, inter alia,[22] that the registration was procured through fraud on the Patent and Trademark Office.  15 U.S.C. §§ 1115(b), (b)(1), 1065.[23]  A court may conclude that a trademark registration was procured by fraud when it finds, by clear and convincing evidence, that the trademark applicant "knowingly ma[de] false, material representations of fact in connection with his application."  MPC Franchise, LLC v. Tarntino, 826 F.3d 653, 658 (2d Cir. 2016) (internal quotation marks and citation omitted); Haggar Int'l, 906 F. Supp. 2d at 108 (requiring a clear and convincing evidence standard).  To establish scienter, the party seeking to invalidate the mark must demonstrate that the applicant knew or should have known that its declaration was false or misleading.  MPC Franchise, 826 F.3d at 659.  The disclosure of the identity of a person or entity that has superior rights in the mark, including another entity that first used the mark, is material to the PTO's

---

[22]     In its counterclaim, Defendant asserts other grounds to cancel the service mark, but in its briefing papers seemingly concedes Plaintiff's arguments that those grounds for cancelation are time barred, and the Court thus deems these arguments abandoned.  See Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014).

[23]     Plaintiff argues that the Defendant's counterclaim to cancel the service mark based on fraud is time barred, citing to Beauty Time, Inc. v. VU Skin Sys. In., 118 F.3d 140, 143 (3d Cir. 1997).  The Third Circuit has subsequently held that an action to cancel a trademark may be brought at any time under section 14(3) of the Lanham Act, 15 U.S.C. § 1064(3), but that such a claim will be subject to the analogous state law statute of limitations if brought pursuant to section 38 of the Lanham Act, 15 U.S.C. § 1120. Marshak v. Treadwell, 240 F.3d 184, 192-95 (3d Cir. 2001).  Defendant does not specify under which statute it brings its cancelation counterclaim, but cites to section 14(3) in its briefing papers.  (Def.'s Mem of Law in Supp. of its Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Partial Summ. J., Docket Entry No. 163, at 47.)  The Court will therefore allow the claim to proceed under section 14(3), which has no time bar.

determination, and, if misrepresented, may support a finding of fraud.  MPC Franchise, LLC v.

Tarntino, 19 F. Supp. 3d 456, 478-479 (W.D.N.Y. 2014), aff'd, 826 F.3d 653 (2d Cir. 2016).

Defendant contends that Plaintiff's representations to the PTO, through Tozzoli,

that the first use of the mark was in March 1961 and that "to the best of his knowledge and belief

[that] no other person . . . has the right to use said mark in commerce . . . when applied to the

services of such other person to cause confusion" were fraudulent.  (Federal Service Mark

Application at 3-4.)  Here, Plaintiff proffers evidence that the date of first use matches that of the

state service mark applications submitted by Defendant and subsequently assigned to Plaintiff.

37 C.F.R. section 2.38(a) explicitly permits an applicant to claim the date a related company or

predecessor in title first used the mark if the applicant concurrently discloses that first use was by

a predecessor. [24]  Because Plaintiff stated in its application that the first use of the mark in 1961

was by Defendant, from which Plaintiff grew and to which Defendant assigned the relevant state

service marks, the stated date of first use is not false, and also conclusively demonstrates a lack

of scienter regarding the representation as to the date of first use.

Defendant next proffers a memorandum by Port Authority's counsel stating that

several WTCA member WTCs opened before the NYWTC and the formation of WTCA, as

evidence that another entity had the right to use the service mark, contrary to the declaration in

plaintiff's federal application.  Here too, the Court must determine whether Plaintiff exhibited

the requisite scienter, specifically whether Plaintiff knew or should have known that its

---

[24]     Defendant also asserts that the March 1961 date of first use is false because the mark was
not, at that time, used specifically for the association services for which Plaintiff sought
the mark in its application.  Plaintiff did not, however, specify in its application that the
first use was for such services, only that the mark "was first used by said predecessor in
the sale or advertising of services rendered in interstate commerce."  (Federal Service
Mark Application, Docket Entry No. 149-22, at 1-2.)

declaration was false or misleading.  <u>MPC Franchise</u>, 826 F.3d at 659.  Defendant has proffered

evidence that Plaintiff was aware of the purported rights of these other WTCs prior to the

application and that Tozzoli was generally uncomfortable about applying for a federal service

mark for that reason.  Plaintiff contends that there is a genuine issue of fact as to whether it knew

or should have known that the rights of any prior users were superior, because all were WTCA

members at the time of the service mark application.  WTCA's unique relationship with its

members, in which it licensed its centralized intellectual property to them, is a sufficient basis for

a jury to conclude that WTCA did not believe that it was subject to any allegedly superior rights

to the marks retained by its members. [25]   <u>See Haggar</u>, 906 F. Supp. 2d at 107 (quoting <u>Maids to</u>

<u>Order of Ohio, Inc. v. Maid-to-Order, Inc.</u>, 78 U.S.P.Q.2d 1899, 1908 (T.T.A.B. 2006) (stating

that an applicant has a reasonable basis for believing "no one else has the right to use the mark in

commerce" unless the right is known to be "superior or clearly established, e.g. by court decree

or prior agreement of the parties").

        Because both parties have proffered sufficient evidence to permit, but insufficient

to compel, a reasonable jury to conclude that Plaintiff either did or did not act with scienter in

declaring that no other parties enjoyed a superior right to use the service mark, the Court denies

summary judgment to both parties with respect to that aspect of Defendant's invalidation

demand.  Because Plaintiff's March 1961 first use date was neither false nor offered with the

---

[25]    In its reply, Defendant asserts that by the time of the federal service mark application, the
Dallas WTC, which existed prior WTCA's incorporation in 1969, had terminated its
WTCA membership (Def.'s Reply Mem. of Law in Supp. of its Mot. for Summ. J.
("Def.'s Mem."), Docket Entry No. 185, at 22-23; <u>see</u> Def. 56.1 Reply ¶ 168.)  Because
Defendant only raised this factual issue on reply, the Court declines to consider it. <u>See</u>
<u>Rowley v. City of New York</u>, No. 00 CIV. 1793 (DAB), 2005 WL 2429514, at *5
(S.D.N.Y. Sept. 30, 2005) (finding that a court may decline to consider new arguments
offered only on reply).

requisite scienter to establish fraud, the Court grants summary judgment to Plaintiff, denies

summary judgment to Defendant, and dismisses Defendant's counterclaim to cancel the service

mark on the basis of misrepresentation of date of first use (4th Counterclaim).[26] [27] [28]

5. Defendant's Counterclaim to Enjoin Plaintiff's Pending Federal Application for WORLD TRADE CENTER and WTC Trademark (5th Counterclaim)

Defendant seeks to enjoin Plaintiff from proceeding on its pending federal intent

to use application for WORLD TRADE CENTER and WTC trademarks, arguing that Plaintiff

has not demonstrated a bona fide intent to use the marks.  "The Trademark Law Revision Act of

1988 (TLRA) . . . changed the Lanham Act by permitting applicants to begin the registration

process before actual use of the mark at the time of filing, so long as the applicant had a 'bona

---

[26]  To the extent Defendant asserts that Plaintiff fraudulently declared to the PTO that Defendant assigned ownership of service marks to it, Plaintiff is granted summary judgment and that aspect of the claim is dismissed based on the previously explained conclusion that ownership of the service marks was indeed assigned to Plaintiff in 1986. The Court accordingly denies Defendant's motion for summary judgment seeking cancelation of the federal service mark based on a misrepresentation of ownership.

[27]  Plaintiff moves to dismiss two aspects of Defendant's 5th Affirmative Defense: that Plaintiff's federal and state registrations were void ab initio and that they were procured through fraud.  Defendant has proffered no evidence that the state registrations, which the Port Authority itself applied for, were procured by fraud.  To the extent this defense is based on the fraudulent procurement of the federal service marks, it is dismissed to the same extent as Defendant's corresponding 4th Counterclaim.  To the extent there is another theory as to why any federal marks were void ab initio, Defendant has failed to assert it and any remaining aspect of that claim is deemed abandoned and will be dismissed.  See Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 397-98 (S.D.N.Y. 2014), aff'd sub nom., APEX Employee Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc., 725 F. App'x 4 (2018) (finding that when a defendant fails to oppose a plaintiff's motion for summary judgment to dismiss an affirmative defense, such defense should be deemed abandoned)

[28]  In its counterclaim, Defendant alleges that a second federal service mark registration application received by the PTO on May 21, 1992 and granted as trademark number 1,749,086, was also fraudulently procured.  (Am. Counterclaims ¶¶ 96-97.)  Because Defendant fails to respond to Plaintiff's motion for summary judgment as to this aspect of his claim, the Court deems it abandoned and grants summary judgment dismissing it.  See Jackson, 766 F.3d at 198.

fide intention to use the mark in commerce' at a later date." M.Z. Berger & Co. v. Swatch AG, 787 F.3d 1368, 1374 (Fed. Cir. 2015) (quoting 15 U.S.C. § 1051(b)(1)) (alterations and emphasis omitted). "[A] 'bona fide intent' to use the mark in commerce at the time of the applications requires objective evidence . . . that the applicant's intent to use the mark was firm and not merely intent to reserve a right in the mark." Id. at 1376. The party opposing registration bears the burden of proving, by a preponderance of evidence, the registrant's lack of bona fide intent, which may be established by the lack of contemporaneous documentary evidence from which a trier of fact could infer such intent. See The Saul Zaentz Co. DBA Tolkien Enterprises, 95 U.S.P.Q. 2d 1723, 1727 (T.T.A.B. June 28, 2010). If the prima facie case is made, the burden shifts to the registrant to establish intent to use the mark at the time of filing. Id. at 1729.

 These proffers

---

29

See Loreal S.A. & Loreal USA, Inc., 102 U.S.P.Q.2d 1434, at *11 (T.T.A.B. Mar. 20, 2012) (quoting Commodore Elecs. Ltd. V. CBM Kabushiki Kaisha, 26 U.S.P.Q.2d 1503, 1507 (T.T.A.B. Feb. 3, 1993) (stating that, to rebut a lack of documentary evidence, the registrant may "adequately explain or outweigh the failure of an applicant to have any documents supportive of or bearing upon its claimed intent to use its mark in commerce").

.

present genuine issues of material fact as to WTCA's intentions at the time of its applications, and both parties' motions for summary judgment with respect to Defendant's 5th Counterclaim must be denied.  Cf. Loreal S.A. & Loreal USA, Inc., 102 U.S.P.Q.2d 1434, at *11 (T.T.A.B. Mar. 20, 2012) ("[V]ague allusions to using the mark through licensing or outsourcing, and failure to take any concrete actions or to develop any concrete plans for using the mark – demonstrates that applicant lacks the requisite bona fide intent.").

6. Counterclaim for Equitable Relief based on Breach of the 1986 Assignment and 2001 Letter (6th Counterclaim)

Defendant claims that Plaintiff breached the 1986 Assignment and 2001 Letter by interfering with its "use of the [WROLD TRADE CENTER or WTC] mark at the [NYWTC], and commencing this litigation."  (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Partial Summ. J., Docket Entry No. 163, at 41.)  In its briefing papers, Defendant points to Plaintiff's attempts to require that the Port Authority obtain its approval for certain actions regarding the marks.  (See Def. 56.1 St. ¶ 273.)  Defendant does not, however, specify the contractual duties Plaintiff has allegedly breached.  See Paul v. Bank of Am. Corp., No. 09-CV-1932 ENV JMA, 2011 WL 684083, at *5 (E.D.N.Y. Feb. 16, 2011) ("In a fatal flaw, [the plaintiff's] complaint fails to identify the specific contractual provision or provisions in the cardholder agreement allegedly breached by defendants and, as a result, the claims must be dismissed.").  The Court, therefore, denies defendant's motion for summary judgment on its 6th

Counterclaim and directs Defendant to show cause why this counterclaim should not be dismissed.

C<small>ONCLUSION</small>

For the foregoing reasons, the Court partially grants Defendant's motion for summary judgment. Plaintiff's complaint is dismissed in its entirety. Defendant is granted summary judgment on its counterclaims for non-infringement (1st Counterclaim) and non-breach of the licensing agreements (2nd Counterclaim), and is granted summary judgment on its 3rd Counterclaim with respect to its right to use the WORLD TRADE CENTER or WTC trademarks affixed to goods in connection with the NYWTC without interference by Plaintiff. The Court denies Defendant's motion for summary judgment with respect to its counterclaims for cancelation of Plaintiff's federal service mark registration (4th Counterclaim); injunction against Plaintiff's pending intent to use trademark registration application (5th Counterclaim); and breach of the 1986 Assignment and the 2001 Letter by Plaintiff (6th Counterclaim), Defendant's motion is also denied as to the balance of its 3rd Counterclaim for a declaration of ownership of the WTC and WORLD TRADE CENTER trademark and its ownership of and right to use the service marks at the NYWTC without interference from WTCA.

Plaintiff's motion for summary judgment is granted in part. The portion of Defendant's 3rd Counterclaim that seeks a declaration that Defendant owns the WTC service marks and is free to use them without WTCA's interference dismissed. The portion of Defendant's 4th Counterclaim that seeks the cancelation of Plaintiff's federal service mark on the basis that it provided a false date of first use to the PTO is also dismissed. Defendant's defense of sovereign immunity (9th Affirmative Defense) is stricken with respect to its federal law claims (Claims for Relief 1 and 2) and the 9th Affirmative Defense is also stricken insofar as it relates to

Plaintiff's claim for a declaration (Claim for Relief 7) that the 1986 License and 2006 Agreement bind the Port Authority to refrain from using the relevant trademarks on goods without WTCA's permission. Defendant's 5th Affirmative Defense with is stricken insofar as it asserts that Plaintiff's state registrations are invalid and that its federal registrations are invalid because they were procured by fraud regarding the date of their first use. Plaintiff's motion for summary judgment is denied insofar as it seeks judgment in Plaintiff's favor on its 6th Claim for Relief for breach of contract and dismissal of Defendant's counterclaims for non-breach of the license agreements (2nd Counterclaim), and an injunction against Plaintiff's pending trademark application (5th Counterclaim). Plaintiff's motion for summary judgment is also denied insofar as it seeks dismissal of the balance of Defendant's 3rd Counterclaim with respect to Defendant's ownership of the WTC trademarks and Defendant's right to use the WORLD TRADE CENTER or WTC trademarks in connection with the NYWTC without interference by Plaintiff, and insofar as it seeks dismissal of the aspect of Defendant's 4th Counterclaim that is based on Defendant's contention that Plaintiff fraudulently represented to the PTO that no party had a superior right to use the federal service mark. Plaintiff's motion for summary judgment is denied to the extent it seeks to strike Defendant's prior use defense (7th Affirmative Defense), its sovereign immunity defense with respect to state law claims for injunctive relief (9th Affirmative Defense), and its 5th Affirmative Defense insofar as that defense rests on the assertion that Plaintiff fraudulently represented to the PTO that no other party had a superior right to use the mark.

By separate order, Defendant will be directed to show cause as to why its 6th Counterclaim should not be dismissed and why the the 3rd Counterclaim, to the extent that it seeks a declaration that the Port Authority owns the WORLD TRADE CENTER and WTC

marks used on goods in connection with the NYWTC, should not be dismissed for lack of subject matter jurisdiction.

The claims remaining for trial are: (1) Defendant's counterclaim for cancelation of Plaintiff's federal service mark registration as procured by fraud, to the extent that counterclaim rests on Defendant's contention that Plaintiff falsely affirmed that it was aware of no other entity with a superior right to use the mark (4th Counterclaim); and (2) Defendant's counterclaim seeking an injunction against the prosecution of Plaintiff's federal trademark applications (5th Counterclaim).

This case remains referred to Magistrate Judge Lehrburger for general pre-trial management. The parties are directed to meet with Judge Lehrburger promptly to discuss settlement. The final pre-trial conference is scheduled for **February 8, 2019** at **10:30 a.m.** (Docket Entry No. 221.) The parties are directed to confer and make submissions in advance of the conference in accordance with the pre-trial scheduling order. (Docket Entry No. 43.)

This Memorandum Opinion and Order resolves Docket Entry Nos. 146 and 162.

SO ORDERED.

Dated: New York, New York
        December 18, 2018

    /s/ Laura Taylor Swain
    LAURA TAYLOR SWAIN
    United States District Judge